[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On May 8, 2000, the petitioner, Diane C.-A., filed a petition pursuant to C.G.S. § 45a-715 et seq. in Probate Court in Killingly, CT seeking to terminate the parental rights of John D., respondent father of Heather D. The mailer was transferred from Probate Court to the Superior Court for Juvenile Matters at Middletown, Child Protection Session, as provided, in C.G.S. § 45a-715 (g). As amended on September 27, 2001, the petition alleged two statutory grounds for termination of John D.'s parental rights. The first alleged ground was that the child had been denied, by reason of an act or acts of parental omission or commission, i.e., that there had been sexual molestation or exploitation, severe physical abuse, or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being. C.G.S. § 45a-717 (g)(2)(B). The second alleged ground was that there was no ongoing parent-child relationship, i.e., "the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the reestablishment of such parent-child relationship would be detrimental to the best interest of the child." C.G.S. § 45a-717 (g)(2)(C).
A trial was held in this court on September 27, 2001. The petitioner called six witnesses to testify, including a Family Relations Officer, a worker from the Department of Children and Families ("DCF"), petitioner's son, her two sisters (maternal aunts of Heather) and herself. The respondent father John D. testified on his own behalf
The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent. . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. § 45a-715 et seq.; see also C.G.S. § 17a-112 (termination of parental rights of children committed to the commissioner of children and families); In re Bruce R., 234 Conn. at 201. In a proceeding for termination of parental rights, the petitioner must prove a ground CT Page 15162 alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z.,26 Conn. App. 58, 63 597 A.2d 842 (1991), cert. denied, 221 Conn. 901
(1992); In re Teresa S., 196 Conn. 18 (1985); Practice Book 33-1, etseq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984) In reKarrlo K., 44 Conn. Sup. 101, 106 (1994), aff'd, 40 Conn. App. 73
(1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal. (84-AB), 192 Conn. 254, 264 (1984). In this case, the petition was amended on the day of trial to add a second statutory ground. Therefore, the adjudicatory date is September 27, 2001 and the court considers evidence pertaining to matters up to that date as relevant in the adjudicatory stage.
If at least one pleaded ground to terminate is found, the court proceeds to the disposition stage. The court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904, aff'd,35 Conn. App. 276, 278, 648 A.2d 881, cert. denied, 231 Conn. 915,648 A.2d 151 (1994). For the reasons stated below, the court grants the petition to terminate the parental rights of John D.
 FACTS
At trial, the petitioner introduced documentary evidence and testimony. The credible evidence admitted at trial supports the following facts by clear and convincing evidence.
Heather D. was born on July 1991 to the petitioner and John D., who although living together at that time, were never married. Also living in the household were the three older children of the petitioner, Paul S., David S., and Kelly S. John D. was unemployed for the majority of the CT Page 15163 time he and the petitioner lived together, but occasionally worked "under the table" doing various jobs. The petitioner has been employed full time since 1994 when she obtained full time employment with Package Systems as a bookkeeper. While she worked, her sister or John D.'s mother cared for Heather, although John D. was often home and was a regular caretaker of Heather at this time.
The relationship between the petitioner and John D. was fraught with problems, including significant substance abuse on the part of John D. and domestic violence. John D. had a very serious substance abuse addiction problem which included alcohol abuse and almost daily use of marijuana.
Physical and Emotional Abuse
John D. began living in the petitioner's. home when one of her sons, David, was a teenager, 15 or 16 years of age. John D. continually subjected David to physical and emotional abuse. On one occasion, John D. threw David against a window sill and cut the back of his head requiring stitches.[1] He also threw him down a flight of stairs, cutting his hand on a railing. John D. also made inappropriate comments to David about Heather's anatomy while changing her diaper when she was a baby, and about his sexual relationship with David's mother. He routinely tormented David about David's father and the fact that he had left David and the family.
On another occasion, John D. was tormenting David and trying to get David to attack him with a kitchen knife.[2] Fortunately, a neighbor heard the incident and intervened. The police were not called. John D. testified that one of the problems in his relationship with David was that David's friends always came over late at night and ate their food and generally refused to listen to their mother. The court credits David's contrary testimony on this point.[3]
Heather was present during the incidents of physical and emotional abuse. David stated: "It didn't matter who was around, really." Heather did not want to be around her father and was intimidated by him. She never expressed to David that she missed her father after he left the household and she was actually more comfortable when John D. was not around.
David's testimony revealed a pattern of physical and emotional abuse at the hands of John D. While a number of specific incidents were described, David's testimony reflects a continuing pattern of abuse. He stated that the physical abuse never really stopped. On five or six separate occasions he attempted to move back into his home with his mother and his brother and sisters, but each time there were physical CT Page 15164 incidents and he would have to move out.
John D. also physically and emotionally abused the petitioner. In 1990, when the petitioner was four or five months pregnant with Heather, John D. threw her on the bed, choked her and told her that she did not deserve to live and that he was going to kill her. As a result of this conduct, she obtained a restraining order against him. John D. testified that he was intoxicated at the time and the two were arguing because he wanted to go out drinking again and the petitioner was trying to prevent him from going. He admitted that he broke a window and was arrested.
Even after he had moved out of the home, John D. harassed and tormented the petitioner and Heather and threatened to take Heather away from the petitioner on a number of occasions. On one occasion, he had stopped them while they were outside the home of a friend and threatened them in the driveway. Later, while they attempted to drive away, he stopped their car in the middle of the road with his car, got out and threatened them again. The petitioner immediately obtained a restraining order after this incident in February, 1999 to protect her and Heather.
Sexual Assault
Petitioner's older children were in the home during most of the time her boyfriend, John D., lived there. Petitioner's daughter Kelly S. has severe limitations. While Kelly lived in the home, John D. entered into a sexual relationship with her. She was 19 at the time. As a result of his conduct, John D. was charged with sexual assault in the second degree and ultimately entered a guilty plea under the Alford doctrine to sexual assault in the third degree on September 15, 1999. He was sentenced on November 19, 1999 and committed to the custody of the Commissioner of Correction for five years, execution suspended after two years to serve, and 10 years probation, with the condition that he register as a sex offender with the Department of Public Safety. John D. has been incarcerated since that date and has a release date of November 8, 2001.
Kelly S., Heather's half-sister, was described by the Family Relations Officer as severely limited, functioning on a preschool level of intelligence. Kelly S.'s condition deteriorated after the sexual assault by John D. She was removed from the petitioner's home, hospitalized in a catatonic state and diagnosed as a catatonic schizophrenic. She was later placed in a DMR group home.
Respondent John D. also has certain limitations, though not as severe as Kelly. According to the report of Philip Cardamone, a clinical psychologist, John D. currently functions at the borderline level with an IQ in the 70s. John D. testified, as he had previously stated, that CT Page 15165 "Kelly came on to him" and that it was not his fault the sexual relationship occurred. John D. admitted to Dr. Cardamone that he was smoking marijuana heavily at the time and further stated that it was partly petitioner's fault because he had told her Kelly was "coming on to him" and she did nothing about it. Further, John D. stated that petitioner should not have left Kelly S. home with him and Heather knowing Kelly was "coming on to him." John D. again testified at trial that it was Kelly's mother's fault for allowing the two of them to be together. Petitioner adamantly denied that John D. told her Kelly was acting inappropriately toward him and testified that she knew nothing about it until after the sexual assault occurred. The court credits petitioner's testimony.
Following entry of the guilty plea, petitioner moved to suspend John D.'s visitation with Heather. A hearing was held before Judge Potter who ordered that any visitation by John D. would be suspended until after John D. was evaluated and had completed a course of therapy for sex offenders.
Visitation
Several witnesses testified concerning visitation. Both petitioner's sisters had supervised the respondent's visitation with Heather for a number of years. These visits commenced in 1997 pursuant to an order of the Superior Court and ceased as set forth above in September, 1999. The maternal aunts generally stated that although there were occasionally problems with the visitation, for the most part, the respondent complied with the supervision and the visits were appropriate. On a few occasions, the respondent had difficulty controlling his anger and the visits were stopped. Further, the respondent's current wife was often there as well with her own three children with whom Heather enjoyed playing. Both maternal aunts and petitioner testified that it was often difficult to get Heather to go for the visits. Although Heather did not want to go, they made her attend the visits as required. John D. attempted to have the visitation order modified to allow unsupervised visits, but this request was denied.
John D. has not had visitation with Heather since he began serving his sentence because he has not yet undergone therapy for sex offenders. Although he testified that he was placed on a waiting list for counseling at the correctional facility, he was not reached until recently. Because he was due to be released in November, 2001, however, the DOC would not allow him to begin the program prior to his release.
While incarcerated, John D. has not sent cards or letters to Heather, nor has he attempted to make telephone contact with Heather. John D. CT Page 15166 testified that he sent cards and letters for Heather to his wife so that they could be forwarded to Heather at some time in the future. He stated that he thought the sentencing court prohibited contact.
The Court finds that the clear and convincing evidence at trial, including court records and transcripts, establishes that while the supervised visitation ceased until after the sex offender treatment was completed, there was no such prohibition against contact of any kind with Heather.[4]
The respondent John D. has never paid anything in child support.
Heather indicated to the DCF worker that she did not want to see her father and that she was afraid he would hurt her. Heather now lives with the petitioner and her husband, James A., whom petitioner married on February 6, 1999. Heather has strong ties to them and gets along well with petitioner's husband who spends time with her, including teaching her how to snorkel over the summer.
When Heather was 7 years old, she expressed her concerns about being alone with her father to Family Relations Officer (FRO) Susan Grant-Nash. At that time, Heather did not want to go to a particular fair during visitation because she was afraid she would lose Aunt Linda (who was supervising the visitation).
FRO Grant-Nash had numerous interactions with John D., Heather, Kelly and petitioner. She observed that John D. did not exercise good decision-making or good judgments in a number of areas. of particular concern to her was the fact that he blamed petitioner and Kelly for his sexual assault of Kelly. Further, he did not understand certain things, including why Kelly's limitations would preclude her from making decisions about consensual sex.
The Sex Offender Evaluation
Prior to sentencing in the criminal case, a clinical psychologist, Philip S. Cardamone, performed a comprehensive psychodiagnostic evaluation of John D. to determine, among other things, his risk level for re-offending. This report was admitted as a full exhibit by agreement of the parties. Dr. Cardamone concluded in the report that John D. presented a low risk for re-offending based on several factors. First, he had his substance abuse under control and had modified his life style by marrying a woman with three children who apparently does not tolerate any substance abuse or use of illegal drugs; second, the victim had been a target of convenience, i.e., Kelly was in the home, and apparently was trying to get the respondent to engage in a sexual relationship with CT Page 15167 her. He has an established social support system. He diagnosed John D. as having alcohol dependence, sustained full remission; cannabis dependence, sustained full remission; and borderline intellectual functioning. While he found John D. at a low likelihood for sexual re-offending, he recommended that he be referred for a period of treatment.
Dr. Cardamone pointed out that John D. does not recognize his degree of responsibility regarding the sexual assault of Kelly. This observation by Dr. Cardamone was consistent with statements made by John D. to the Family Relations Officer and to the DCF worker. John D. has consistently stated and continued to state during trial that Kelly initiated the sexual relationship and that petitioner was to blame because she left him alone with Kelly and Heather.
 DISCUSSION
I. ADJUDICATION
Each statutory basis set out in General Statutes Sec. 45a-717 (f) is an independent ground for termination. The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence. In re Bruce R., 234 Conn. 194 at 204 (1995); seealso In re Baby Girl B., 224 Conn. 263, 618 A.2d 1 (1992) (in cases arising under C.G.S. § 17a-112 (b)).
A. Act of Commission or Omission
The first ground alleged in the petition for termination is an act of parental omission or commission. The specific act alleged is that the respondent committed sexual molestation and exploitation, severe physical abuse or a pattern of abuse. There is no allegation that John D. sexually molested Heather, but rather that he subjected her to an atmosphere where others in the home were physically and sexually abused.
The statute provides: "the child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control, necessary for his physical, educational, moral or emotional well-being." C.G.S. § 45a-717 (g)(2)(B). "There is nothing in this clear statutory language that limits the acts of commission or omission to the serious physical injury of a child, rather than the serious emotional injury of a child." In re Sean H., 24 Conn. App. 135, 144
(1991).
The presence of battering in the home has a detrimental effect on children. Knock v. Knock, 224 Conn. 776 (1993). In In re Sean H., CT Page 1516824 Conn. App. 135, the Appellate Court recognized that emotional injury constitutes an act of omission or commission. Here, John D. engaged in a pattern of physical and emotional abuse of David and the petitioner while Heather was in the home. He sexually assaulted Heather's older half-sister while Heather was in the home. As set forth in In re JuvenileAppeal, (84-6) 2 Conn. App. 705, cert. denied, 195 Conn. 801 (1985), "In striking at the heart of the family, the respondent demonstrated total disregard for the impact of his actions upon the emotional well-being of his [child.]" By sexually assaulting her half-sister and physically and emotionally abusing her mother and her brother, John D. struck at the heart of this family.
Here, John D. who was almost daily under the influence of drugs or alcohol, created an atmosphere of terror in the house in which Heather lived. He physically abused the petitioner (his girlfriend) and her son and sexually assaulted her severely limited daughter. All of this conduct created a pattern of abuse as alleged in the petition causing Heather to be denied by John D. the care, guidance or control, necessary for her physical, educational, moral or emotional well-being. The court finds by clear and convincing evidence that this statutory ground has been proven.
B. No Ongoing Relationship
This ground is established when there is no ongoing parent-child relationship with the parent, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child.
No ongoing parent-child relationship contemplates a situation in which, regardless of fault, a child either has never known their parent, or that no relationship has ever developed between them, or that the child has lost that relationship so that despite its former existence it has now been completely displaced. In re Juvenile Appeal (Anonymous),181 Conn. 638, 645-46 (1980). In any case, "the ultimate question is whether the child has no present memories or feelings for the natural parent." In re Juvenile Appeal, (Anonymous), 177 Conn. 648, 670 (1979). The mere recognition of an individual as a parent will not defeat this ground. In re Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984),cert. denied, 195 Conn. 801 (1985). The presence or absence of positive feelings on the part of the child is determinative. In re Shane P.,58 Conn. App. at 240. CT Page 15169
In the adjudicatory phase, the petitioner must establish (1) that no ongoing parent-child relationship exists; and (2) that the allowance of further time for the establishment of such a relationship would harm the interests of the child. In re Jonathan G., 63 Conn. App. 516, 525
(2001).
In this case, the court finds that the child does not have positive feelings toward her father. Throughout a lengthy period of court-ordered supervised visitation, she did not express a desire to attend the visitation sessions, nor did she wish to see her father. Rather, Heather was made to attend the sessions due to the persistence of her mother and her maternal aunts, who had to convince her to go in compliance with the court-ordered schedule. During the visits, it was the children of her father's wife whom she was most anxious to see and with whom she generally played during the visits. During the last two years, there has been no visitation because her father has been incarcerated and has not undergone the sex offender treatment which was a prerequisite to resumption of visits. During those two years, Heather has not expressed a desire to see her father and has not received cards, letters phone calls or communication of any kind from him. Heather has been described as understanding that her father "hurt her sister," and has expressed fears that he will hurt her too.
John D. claims that, essentially, it is the action of the State in failing to provide sex offender counseling and treatment that precluded him from having an ongoing parent-child relationship with Heather. In Inre Valerie D., 223 Conn. 492, 499, 613 A.2d 748 (1992) our Supreme Court held that the State was not permitted to terminate the parental rights of a mother on the basis of no ongoing parent-child relationship where the child had been removed from her mother's care from nearly the moment of birth through the adjudication date. Id. at 531. In Valerie D., the state's custody of the child created the conditions which led to the lack of an ongoing relationship. Valerie D. has since been interpreted to prohibit termination where actions of the State preclude the relationship. See, e.g., In re Amelia W., 62 Conn. App. 500 (2001); In reShane P., 58 Conn. App. 234, 242 (2000). In In re Shane P.,58 Conn. App. at 242, the Appellate Court found that although bureaucratic mismanagement caused the department to fail to meet the respondent mother's request for visitation while she was imprisoned, that failure was not the primary cause of the lack of a parent-child relationship. Respondent mother was not incarcerated during the first year of Shane P.'s life and, during that time, she chose not to develop a relationship with her son, but instead lapsed into drug use and disappeared for a number of months. Id. at 241.
Here, as in In re Shane P., 58 Conn. App. at 242, there was "no such CT Page 15170 intrusive intermeddling by the state." The State's failure to provide sex offender counseling to the respondent while he was incarcerated cannot be viewed in the same light as the circumstances of Valerie D. Certainly, the defendant's incarceration was due to circumstances of his own making, i.e., his sexual assault of Heather's mentally disabled sister in their home. In In re Amelia W., 62 Conn. App. 500, the Appellate Court found that Valerie D. does not apply when it was the respondent's behavior, not the conduct of the department, that prevented the relationship from developing. 62 Conn. App. at 506. Here it was the respondent's criminal conduct that prevented the relationship from continuing. As our courts have recognized, there is no entitlement to rehabilitative programs while incarcerated. See Wheway v. Warden,215 Conn. 418, 431 (prison authorities have full discretion to grant or deny early release programs) (citing Moody v. Dagget, 429 U.S. 78, 88-89
n. 9 (prison officials have full discretion to control certain conditions of confinement, including eligibility for various rehabilitation programs, such that there is no statutory or constitutional entitlement sufficient to invoke due process)); Smith v. Liburdi, 26 Conn. App. 254,259, 600 A.2d 17, 20 (1991), cert. denied, 221 Conn. 910 (1992). While the State may provide such counseling for sex offenders while incarcerated, the inability to provide this for John D. within the time frame of his sentence does not amount to "intrusive intermeddling" by the State such as would prevent his ongoing parent-child relationship.
John D. has not had contact of any kind with Heather, including cards, letters or telephone calls since his incarceration, even though such contact was not prohibited. Once it became clear to John D. that he was not going to receive sex offender treatment while incarcerated, and after the evaluation was completed, he certainly was able at that point to request a modification in the visitation, or clarification regarding contact. Even if the Court credits the respondent's testimony that he thought contact of any kind was prohibited, he could have sought to renew contact with Heather. He failed to do so.
As set forth in In re Shane P. and In re Amelia W., "[I]n considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." As set forth in In re Jonathan G., 63 Conn. App. at 525, "feelings for the natural parent connotes feelings of a positive nature only." Here, like the circumstances presented in In re Amelia W., the child does have memories and feelings about her father, but those feelings are feelings of fear and apprehension. As in In re Amelia W., "no positive emotional aspects of the relationship survived," and, therefore, there is no ongoing parent-child relationship. Thus, giving great weight to the clear absence of positive feelings on the part of the child, the Court finds CT Page 15171 that this ground has been proven by clear and convincing evidence.
The court finds by clear and convincing evidence that it would not be in the child's best interest to allow further time to develop the parent-child relationship. This 10 year old child, who has expressed fear of her father and who does not wish to see her father, is bonded with her mother and her mother's new husband. The respondent continues to fail to accept responsibility for the sexual assault on Heather's half-sister. In view of the child's need for permanency, to allow additional time would be detrimental to Heather's best interests.
II. DISPOSITION
This court has found by clear and convincing evidence that the two statutory grounds alleged as to Heather's father for the termination of his parental rights have been proven. The Court must now consider and make the findings required by C.G.S. § 45a-717 (h). In re Bruce R.,234 Conn. at 205.
Statutory Findings
The written factual findings required by C.G.S. 45a-717 (h) are recorded below. The Court has considered the evidence and information relevant to each of these findings in the course of determining whether to terminate parental rights under this section.
1. Timeliness, Nature and Extent of Services — 45a-717 (h)(1)
No services were provided or offered to the respondent by a child-placing agency to facilitate reunification since no child-placing agency was involved in this matter except to the extent that DCF prepared a study at the request of the Killingly Probate Court concerning the petition. This DCF study recommended termination of John D.'s parental rights.
2. Applicable Court Orders 45a-717 (h)(2)
The Court considers the terms of any applicable court orders entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
For the most part, John D. complied with visitation orders. There were some notable exceptions, however. He failed to obey the rules of the supervised visitation on some occasions where the maternal aunts had to end the visit because John D. lost his temper or acted inappropriately. CT Page 15172 He did fail to attend visits for about a six week period.
Because this was a probate matter and DCF was not the petitioner, there were no court orders regarding any specific steps. There was no involvement of a child-placing agency except to the extent noted above.
3. Feelings and Emotional Ties of the Child — 45a-717 (h)(3)
Clearly, Heather has strong emotional ties to her mother and her mother's new husband. Based on the evidence in the case, the Court does not find any strong emotional ties to respondent. To the contrary, Heather has expressed a desire not to see or have contact with him. The DCF worker who conducted the study for the probate court described Heather's feelings as follows: "her expressions appeared to be her own and not a recitation of adult conversation." (Pet. Ex. 1 at p. 5). Heather has adjusted well to her mother's new husband and continues to have a strong emotional bond with her mother and her mother's husband.
4. The age of the child — 45a-717 (h)(4)
Heather D. was born on July 1991, and is therefore 10 years old. She was 5 years old when her father sexually assaulted her severely mentally disabled half-sister in their home. She has not seen or spoken with him since he was sentenced to jail on November 10, 1999. The evidence reflects that Heather is mature enough to express her views and has done so articulately. As the DCF worker indicated, they appeared to be Heather's own independent views and not merely a recitation of adult conversation.
5. Efforts the parent has made to adjust his circumstances, conduct orconditions to make it in the best interest of the child to return thechild to the parent's home in the foreseeable future, including, but notlimited to, (A) the extent to which the parent has maintained contactwith the child as part of an effort to reunite the child with theparent, provided the court may give weight to incidental visitations,communications or contributions and (B) the maintenance of regularcontact with the guardian or other custodian of the child. — 45a-717(h)(5)
John D. has not made any efforts to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return the child to him (or to not terminate his parental rights) at his home in the foreseeable future. He has not maintained contact with the child or maintained regular communication with the child's mother.
6. The extent to which he has been prevented from maintaining aCT Page 15173meaningful relationship with the child by the unreasonable act of anyother person or by the economic circumstances of the parent. —45a-717 (h)(6)
The only thing that has prevented John D. from continuing to have an ongoing parent-child relationship with Heather is his own conduct which has resulted in his incarceration for the last two years. That incarceration has in turn resulted in his inability to obtain the sex offender counseling and treatment which was required before John D. would be permitted to resume supervised visitation. These are matters of the defendant's own making. See In re Shane P., 58 Conn. App. at 242. The economic circumstances of John D. have not prevented him from maintaining a meaningful relationship with the child.
III. Conclusion
The Court finds that the evidence is clear and convincing that the best interests of Heather are served by termination of her father's parental rights. The petition seeking termination is hereby granted.
It is So Ordered this 13th day of November, 2001.
Jongbloed, J.