MEMORANDUM OF DECISION
On February 5, 2001 the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Immacolate D and Jimmie T as to their daughter, Melissa. The respondent parents were properly served with the petition and both were represented by counsel throughout the court proceedings.[2] This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court. The statutory ground alleged as to Ms. D is a failure to rehabilitate and the statutory grounds alleged as to Mr. T are a failure to rehabilitate and no ongoing parent-child relationship. The termination of parental rights trial commenced on January 14, 2002, continued on January 16, 2002 and on February 19, 2002 and concluded on March 26, 2002.[3]
The court makes the following findings of facts and conclusions of law by clear and convincing evidence.
Melissa was born on February 1999. On March 16, 1999 DCF invoked a ninety six hour hold on the child and on March 18, 1999 the court signed an exparte order granting temporary custody of Melissa to DCF because of allegations that respondent father had shaken Melissa and respondent mother could not protect the child. On November 10, 1999 Melissa was adjudicated uncared for and was returned to her mother's care under a CT Page 4159 three month order of protective supervision.[4]
In March of 2000 DCF sought and obtained a second order of temporary custody of Melissa. The allegations surrounding the March 2000 order of temporary custody involved issues of mother's homelessness and mother leaving Melissa with an inappropriate care giver, even after having signed a service agreement with DCF indicating that she would not do so again[5]. The order of protective supervision was modified and Melissa was committed to DCF on March 17, 2000. Melissa has remained committed to DCF to this time.
In May of 1999, respondent father was convicted of attempted vehicular manslaughter, involving his brother, Kenneth T as the victim. Respondent father was sentenced to a four and one half years prison term. He remains incarcerated and believes he will be released from prison in late 2002.[6]
DCF has made reasonable efforts to reunify Melissa with the respondent parents.
Upon Melissa's return to respondent mother under the November 1999 order of protective supervision, court ordered specific steps were put into place. (State's exhibit C).[7] One of the services put into place in October of 1999 was the Yale Child Study Intensive Family Preservation Program. (IFP) Two workers from the IFP program were sent into respondent mother's home to provide family services, such as, working with DCF and respondent mother to identify goals, and to work with respondent mother on anger management and parenting skills.[8] IFP was put in place prior to Melissa's return home and the plan was to have IFP workers in the home two to three times a week for one to two hour visits. IFP workers worked with respondent mother for approximately two weeks prior to Melissa's return to respondent mother's care in early November of 1999.
The usual duration of the IFP program is twelve to sixteen weeks. IFP closed its case on November 22, 1999. The IFP worker testified that respondent mother missed many of the scheduled appointments, the baby was not accessible to the IFP workers, and the final straw was when respondent mother verbally abused and physically threatened the IFP worker during a visit.
DCF attempted to offer services to deal with respondent mother's impulsiveness and anger issues. To that end, Ms. D was referred to Yale Behavioral Clinic, formerly known as Hamden Behavioral Health. Scott Migdole, a licensed clinical social worker, began seeing respondent mother in May of 2000. Mr. Migdole was to offer Ms. D therapy to work on her poor impulse control, her strong tendency to blame others for her CT Page 4160 problems, her ongoing problem with seeing herself as a victim, and her distorted perceptions about what was going on around her. Mr. Migdole believed respondent mother would benefit more from a didactic group therapy model rather than with one on one counseling.
In July of 2000 Ms. D left disturbing telephone messages for Mr. Migdole. When he attempted to talk to respondent mother about the messages, she refused to discuss them, used profanity and walked out of the office. Respondent mother did come back for the next four to five months but not consistently and she was discharged for nonattendance in December of 2000.
Given Ms. D acrimonious relationship with DCF, which will be discuss in greater detail shortly, visits were moved from the DCF office to Southern Connecticut State University.[9] Visits at Southern began on July 6, 2000. Overall, Ms. D was appropriate with Melissa during the visits. The sessions at Southern ceased on December 4, 2000 however, due to respondent mother's attitude toward Ms. Janes, the graduate student overseeing the visits and a disturbing voice mail message left by Ms. D on Barbara Van Hoff's, the clinic's coordinator, answering machine. Ms. D would exhibit hostile behavior when angered, using obscenities. Said behavior would sometimes occur in front of Melissa. In addition to respondent mother's inappropriate behavior, the timing of the visits, 3 p. m. could not be changed to 4 p. m. to accommodate Ms. D new work schedule. Ms. D became angry and told Ms. Janes that she did not want to come anymore and left the clinic, still talking to Ms. Janes in a hostile manner.
In June of 2001 DCF attempted to make a referral to R'Kids, an agency that provides supervised visitation and case management services. Respondent mother never signed the release to begin the intake process until October of 2001. Ms. D missed two appointments and never followed through with the referral and therefore no visits at R'Kids were ever scheduled.
Ms. D had a total of five different DCF workers assigned to the case during the time the case was handled by the New Haven DCF office.[10]
Repeatedly Ms. D would complain of an inability to work with the assigned caseworker and request that a different worker be assigned. Repeatedly, respondent mother would exhibit angry, hostile and abusive behavior toward the DCF worker. Barbara Stark, a DCF supervisor who supervised four of the five New Haven DCF workers who were had the case, testified that Ms. D would leave threatening voices messages at DCF.
Respondent mother asked the court to transfer the case out of the New Haven DCF office to another DCF regional office. The court, Esposito, CT Page 4161 J., ordered that the case be transferred and in January of 2001, Melissa Clymer, a DCF worker in the Middletown office was assigned the case. Ms. D was given a "fresh start" with Ms. Clymer as the social worker in the Middletown office.
Initially, things went well between Ms. Clymer and Ms. D and, although the termination of parental rights petition had been filed, there was a decision to place the petition on hold and once again work toward reunification of Ms. D with Melissa.
Any progress toward reunification was short lived. Inevitably Ms. D became angry with Ms. Clymer, and made threatening, hostile statements to Ms. Clymer. While Ms. Clymer had the case, respondent mother was offered thirty nine visits. Melissa was transported for the visits. Ms. D showed for twenty one of the visits. Visits stopped in November of 2001 because Ms. D was not appearing for the visits and not returning Ms. Clymer's calls.[11]
Respondent mother chronically struggled to maintain stable housing. At trial Ms. Clymer testified that Ms. D was presently living' with her mother. Maternal grandmother refused to be a resource for Melissa. Respondent mother is welcome at maternal grandmother's house but Melissa is not.[12] In May of 2001, Ms. D moved in with a friend but it did not work out and she moved back to her mother's. For a brief period of time, shortly after Melissa's birth, Ms. D lived with Melissa's paternal grandparents but that proved unsuccessful.
Dr. Meier, in his June 2000, court ordered evaluation concluded that:
 "Mother also has little insight into the effects of her hostility, anger, and aggressive behavior on others. She admits to making threats against others, but somehow believes they should know that she would never carry out such threats. The anger directed at others is a means of deflecting responsibility from herself as well as to avoid dealing with her own problems and insecurities. Anger management will need to come from therapeutic interventions that address these underlying insecurities and sources of anger, as opposed to merely sitting in anger management training alone. Both interventions are necessary. Given the fact that this has been a long-term problem, change will not be easily accomplished."
State's exhibit H p. 10. CT Page 4162
In an another attempt to engage Ms. D is the requisite counseling Ms. Clymer and the guardian ad litem for Melissa, Ms. Holmes, made a referral to the Dixwell Newhallville Mental Health Center in April of 2001. The clinic was to provide case management services, individual counseling, and anger management classes. Two initial intake appointments were set up for Ms. D, she missed both Appointments. In June of 2001, respondent mother informed DCF that she would not attend the center for treatment.[13]
Ms. D could not effectively work with any of the service providers contracted to provide reunification services. As outlined above, DCF made reasonable, if not heroic efforts, to reunify Ms. D with Melissa. It is clear from the facts set forth above, Ms. D is unwilling to benefit from reunification efforts.
DCF made reasonable efforts to reunify Mr. T with Melissa.
Mr. T has been in prison since Melissa was just a few weeks old. He is due to be released from prison in the latter portion of 2002. Mr. T, however, will be required to live in a halfway house for seven months upon discharge from prison. Although DCF has facilitated monthly visits at the prison between Mr. T and Melissa, Mr. T's protracted incarceration has precluded DCF from offering any other services to respondent father.
State's exhibit B, p. 20 lists the services offered by the Corrections Department to prisoners, which include individual counseling, domestic violence, and anger management. Mr. T did complete parenting classes while incarcerated. Mr. T told Dr. Meier that he was involved in a church group and the "Tier II" program in prison. Mr. T told Dr. Meier that he could not obtain any other counseling or therapy while incarcerated because none were made available to him. Dr. Meier stated in his November 2001 report that "(t)here has been little consistency in his [Mr. T's] programming since he has been moved seven times since he was incarcerated. This was due primarily [to] crowding in the institutions and not due to any problems he was experiencing." State's exhibit I p. 8. Ms. Clymer testified however, that Mr. T had been in a minium security facility and got into a physical altercation with another inmate and thereafter Mr. T was placed in a higher [security] level facility. Anger management and domestic violence counseling were part of the court ordered specific steps entered on March 18, 1999. (State's exhibit F).[14]
DCF made reasonable efforts to reunify Mr. T with Melissa. This case in analogous to In re Hector L., 53 Conn. App. 359 (1999). In that case the respondent father claimed that DCF could have done more to provide reunification services while he was incarcerated. The court disagreed CT Page 4163 holding: "(T)he respondent failed to identify the additional types of services the department could have provided him or how such services could have been offered while he was incarcerated. Although the respondent could not avail himself of the programs normally available through the department because of the restraints imposed by his incarceration, he is not excused from making use of available programs offered by the department of corrections. See In re Roshawn R., supra,51 Conn. App. 53". In re Hector L., 53 Conn. App. at 372.
There was contradictory testimony and evidence as to why Mr. T did not obtain more than just parenting classes in prison. The overriding issue before this court is not why Mr. T did not obtained more services in prison but whether DCF made reasonable efforts to reunify respondent father and Melissa. "Reasonable efforts means doing everything reasonable, not everything possible. (Citations omitted.)" In re EbonyH., 68 Conn. App. 343, 349 (2002). Mr. T is serving a lengthy prison sentence, a prison sentence that has effectively encompassed Melissa's entire life and one that will not end until later this year. Other than supervised visitation, Mr. T was unable to benefit from reunification efforts that DCF had to offer.
STATUTORY GROUNDS
 Failure to Rehabilitate
 Ms. D
Statutory grounds exist to terminate parental rights when a child has been found by the superior court to have been neglected or uncared for in a prior proceeding and the parent failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of a child. C.G.S. §17a-112 (j)(3)(B). In analyzing a respondent parent's rehabilitative status the court must look at the "status as it relates to the needs of the particular child, and further, such rehabilitation must be foreseeable within a reasonable time." (Citation omitted.) In re RoshawnR., 51 Conn. App. 44, 54-55 (1998). DCF has met its burden as to this statutory ground as to both respondent parents.
For over two years, Ms. D has not engaged in the requisite mental health counseling that Dr. Meier indicated was so necessary to address her deep seeded anger and poor impulse control. Respondent mother's failure to engage in treatment to deal with her anger and impulse issues is particularly lethal given Melissa's special needs. At almost three years of age, Melissa is small for age and has problems gaining weight. CT Page 4164 She suffers from prolonged temper tantrums, she eats inedible objects, smears feces on walls when upset, she bites herself and does not respond normally to pain, she pulls her hair, has problems with gross motor skills, loses balance, has speech delays and has problems with sensory input. In addition to routine medical care, Melissa requires services from a nutritionist, psychologist, and occupational therapist. Melissa receives Birth to Three services and she receives speech therapy.
Ms. D has never been able to work with any of the proposed service providers. There is nothing to suggest that Ms. D would fare any better with service providers absent DCF involvement. Dr. Meier concluded that once respondent mother feels insecure or threatened she lashes out and the service is inevitably disrupted. Given Melissa's need for a variety of service providers to have consistent and continued contact and input into Melissa's life, Ms. D's inability to control her anger and effectively work with service providers makes it impossible for her to be a parent to Melissa.
Enough time has passed and enough attempts have been made to determine whether Ms. D would do what it would take to make it possible for Melissa to be placed back in her care. Melissa is three years old and has spent over two and one half years in foster care. Any improvement in Ms. D's behavior has been minimal and not enough to appreciably improve her ability to parent Melissa.
Mr. T
To Mr. T's credit he did attend parenting classes in prison. Mr. T maintained the monthly visits in prison with Melissa and was appropriate during the visits. The critical issue before this court is whether Mr. T was better able to resume the responsibilities of parenting Melissa at the time the termination of parental right petition was filed, in January of 2001, then when Melissa was committed to DCF in March of 2000. In reHector L., 53 Conn. App. 359, 367 (1999). The answer is that he was not. The next consideration is whether Mr. T could achieve the requisite degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of
Melissa, Mr. T could assume a responsible position in Melissa's life. Mr. T will be released from prison in November of this year. He will then be required to spend seven months in a halfway house.[15] Melissa has spent all but a few months of her life in foster care. Mr. T is at least one year from being able to reintegrate back into the community. To require Melissa to wait another year for permanency, particularly given her special needs, to see if Mr. T can assume a responsible position in her life is an unreasonable period of time. CT Page 4165
Another consideration for this court in finding a failure to rehabilitate by Mr. T is the nature of his relationship with Ms. D. The degree of domestic violence that existed between the respondent parents, prior to Mr. T's incarceration, is of concern. Neither respondent parent has obtained the necessary counseling to learn to deal with their propensity toward anger and/or violence. Although both respondent parents vacillate as to whether they will reconcile upon Mr. T's discharge from prison, the potential for Mr. T and Ms. D to reunite would preclude Mr. T from being able to assume a responsible position in Melissa's life.
No Ongoing Parent-Child Relationship
DCF alleges that there is no parent-child relationship between Mr. T and Melissa. C.G.S. § 17a-112 (j)(3)(D) defines no ongoing parent-child relationship. "(T)here is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child."
As indicated previously, Mr. T was incarcerated shortly after Melissa's birth and will continue to remain incarcerated until November of 2002. Melissa's only contact with her father has been through monthly, supervised visits at the prison. Mr. T is appropriate with Melissa during the visits and Melissa warms up to Mr. T over the course of each visit.
Melissa does not recognize Mr. T as her father. Obviously, Mr. T has not met Melissa's daily needs and, other than the monthly prison visits, he has made no telephone calls or mailings to DCF to inquire about Melissa's welfare.
It would be detrimental to Melissa's best interest to allow further time to elapse to see whether a parent-child relationship could be established. Melissa's special needs, and her already too long stay in foster care make waiting even another six months in foster care untenable. In re Jonathan G., 63 Conn. App. 516 (2001).
DISPOSITION
In the dispositional phase of a parental rights termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." It is in Melissa's best interest to have respondent parents rights terminated.
In accordance with C.G.S. § 17a-112 (k) the court makes the CT Page 4166 following findings:
(1) The court must look at the timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent. This court has already outlined the extensive services and programs offered to respondent mother to facilitate reunification. DCF concerted efforts failed because respondent mother refused to engage in treatment to deal with her anger and victimization issues and poor impulse control. Respondent mother's "me against the world" mentality has cost her the chance to reunify with Melissa.
As to Mr. T the services offered were limited due to his extended period of incarceration. The cause for his incarceration is due to behavior and decisions he made. DCF facilitated monthly prison visits between Mr. T and Melissa.
(2) This court finds, for reasons stated within this decision, that DCF made reasonable efforts to reunite the parents with Melissa pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended.
(3) There were court ordered specific steps entered into by the parties in this case. Three different sets of specific steps were court ordered as to Ms. D. (States' exhibits C, D, E). Respondent mother failed to engage in the requisite counseling. She did not cooperate with DCF or with the myriad of service providers. She struggled to obtain and maintain adequate housing. Ms. D did not maintain the visitation schedule.
Mr. T did obtain parenting counseling, as required by the specific steps. There was no verification of anger management or domestic violence counseling.
(4) Dr. Meier, conducted a court ordered parent-child interactional with Melissa and each of the respondent parents. Dr. Meier observed a warm affectionate relationship between Ms. D and Melissa and the anger that Ms. D exhibited and was having a hard time controlling, prior to Melissa entering the room, vanished after the child joined the evaluation. "Mother was age appropriate and attentive, and the child seemed to be content with mother. There was not a great deal of physical affection on the part of either." State's exhibit I p. 12. Dr. Meier concluded that: "It appears at this time that she [Melissa] views mother as someone she enjoys seeing, but there is a limited bond. She does not view mother as the primary provider of basic needs, and therefore is not viewed as a psychological parent." State's exhibit I p. 14. CT Page 4167
Dr. Meier concluded as to Mr. T that: "Father has had little contact with the child since he has been incarcerated. The child initially resisted staying with him, but after settling down did interact a bit more comfortably. She does not view him as a psychological parent, and given the circumstances she would not be expected to do so." State's exhibit I p. 14. Suffice it to say that Melissa views Mr. T as an acquaintance, not as a parental figure.
Melissa has been in the same foster family for her entire stay in foster care. She is bonded to her foster family and they have done an excellent job of addressing Melissa's special needs. Her foster family wish to adopt Melissa.
(5) Melissa is now three years old. She has spent all but four months of her life in foster care. She deserves to leave the limbo of foster care and attain permanency in adoption by her foster family.
(6) Ms. D has done little to conform her behavior or adjust the circumstances that brought Melissa into foster care to make it in Melissa's best interest to return to her mother's home in the foreseeable future. Respondent mother's lack of counseling, her inability to work with service providers and with DCF, and her noncompliance with visits have all been discussed previously. To her credit she did obtain training and employment. Whatever changes were made have been too little too late.
Mr. T has remained incarcerated for virtually Melissa's entire life. His release and reintegration back into the community will not come in time, in relationship to Melissa's best interest. Other than the monthly prison visits, Mr. T made no other effort to inquire about Melissa's welfare or to connect with his daughter.
(7) This court is not aware of any parent, person or agency that has prevented either parent from maintaining a meaningful relationship with Melissa. Mr. T's counsel argued at trial that, if Ms. D had rehabilitated herself, Mr. T, when finally released from prison, could then have begun the process of establishing a parent-child relationship. His argument is unpersuasive. It was Mr. T's protracted period of incarceration, his failure to obtain the necessary anger management and domestic violence counseling, and his desire to possibly reconcile with Ms. D, and not Ms. D's failure to rehabilitate, that has cost him his parental rights as to his daughter.
Respondent mother's motion to transfer guardianship to the paternalgrandparents. CT Page 4168
Subsumed into the termination of parental rights trial was a motion, made by respondent mother and orally joined in by respondent father, to transfer guardianship of Melissa to her paternal grandparents. DCF and the child's attorney opposed the motion.
The paternal grandmother testified at trial that for approximately the first and one half years that Melissa was in DCF care she had no contact with the child. By the time the paternal grandmother testified at trial in January of 2002, paternal grandmother had had three visits with the child since October of 2001. Paternal grandmother admitted that back in 1980 or 1981 there had been an allegation of neglect regarding bruises her son Jimmy had on his cheek. Jimmy was not removed from her care, she just was told to stop doing whatever it was that caused the bruises.[16]
Paternal grandmother testified that she lives with her exhusband. They have an older son, Kenneth, who at the moment, was not residing with them but rather with a girlfriend in Branford.[17] Ms. T testified that if the transfer of guardianship were granted, guardianship would have to be given solely to her because her exhusband, the paternal grandfather, has a bad heart and a bad knee. Ms. Clymer testified that paternal grandfather was "divided' about caring for Melissa and wanted assurance that they (the grandparents) would be protected from Ms. D.
Ms. T testified that Ms. D can be very nasty to her. Ms. T testified that if Melissa were placed with her that she is afraid of what the respondent mother might do. Ms. T also had concerns that she expressed to DCF in May of 2001 regarding the possibility of Jimmy T and Ms. D getting back together. Ms. T admitted that Ms. D posed an unknown level of danger to the paternal grandparents. Ms. T stated that Ms. D is "capable of absolutely anything" and paternal grandmother's only recourse, to keep Melissa and herself safe, would be to call the police.
This court believes that paternal grandmother does love Melissa and would do everything in her power to keep Melissa safe and give her a loving home. Unfortunately this court does not believe that paternal grandmother can effectively deal with respondent mother who has deep seeded and untreated anger issues. Nor can paternal grandmother assert herself in regard to her son Jimmy who will be in a halfway house in approximately November of 2002. In addition there is a history of domestic violence between the respondent parents, and their potential reunification, once Mr. T is released from prison, poses a significant concern to this court. Furthermore, Melissa is in a nurturing, stable and loving foster home, the only home and parents she has ever known. It is in Melissa's best interest to remain with her foster family and move toward adoption. Therefore the motion to transfer guardianship is hereby CT Page 4169 denied.
CONCLUSION
Based on the foregoing, it is in Melissa's best interest to terminate the parental rights of Ms. D and Mr. T. It is hereby ordered that their parental rights are hereby terminated. The commissioner of the Department of Children and Families is hereby appointed the statutory parent. It is hereby ordered that a permanency plan be filed within the next thirty days. Further status reports and permanency plans shall be filed in accordance with state and federal law.
The court approves the permanency plan of termination of parental rights and adoption. The court finds that DCF has made reasonable efforts to effectuate the permanency plan.
Bernadette Conway, Judge of the Superior Court