[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On May 9, 2001, the petitioner, the Commissioner of the Department of Children and Families, ("DCF"), filed a petition pursuant to C.G.S. § 17a-112 et seq. to terminate the parental rights of Keisha R. and James P. to their child Felicia B. Respondent mother, Keisha R., consented to termination of her parental rights with regard to Felicia B. and three siblings, Zakeya B., Tiquan B., and Kirk R., Jr. Respondent father of Felicia B., James P., contests termination of his parental rights. Trial of this matter took place before this court on November 1, 2001 at the Regional Child Protection Session at the Middlesex J.D.[1]
For the reasons stated below, the court finds in favor of the petitioner.
The two statutory grounds alleged against James P. in the petition filed May 9, 2001, were (1) that the child, Felicia B., was found in a prior proceeding to have been neglected or uncared for and the father had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and the needs of the child, he could assume a responsible position in the life of the child (C.G.S. § 17a-112 (j)(3)(B)(i)); and (2) that there is no-ongoing parent-child relationship with respect to the father that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral or educational needs of the child, and to allow further time for the establishment of the parent child relationship would be detrimental to the best interest of the child. (C.G.S. § 17a-112 (j)(D)).
The court finds that notice of this proceeding has been provided in accordance with the provisions of the Practice Book. The court further finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter and that no action is pending in any other court affecting custody of the child.
"The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his [or her] parent . . . [As such, it] is a most serious and sensitive judicial action." (Citation omitted; internal quotation marks omitted.) In re Jonathan M.,255 Conn. 208, 231, 764 A.2d 739 (2001); In re Bruce R., 234 Conn. 194,200 (1995).
The termination of parental rights is governed by statute. C.G.S. § 17a-112. In a proceeding for termination of parental rights, the petitioner must prove a ground alleged in the petition, as of the date of filing the petition or the last amendment, by clear and convincing evidence. In re Joshua Z., 26 Conn. App. 58, 63 597 A.2d 842 (1991) certdenied, 221 Conn. 901 (1992); In re Teresa S., 196 Conn. 18 (1985); CT Page 1174 Practice Book 33-1 et seq. Only one ground need be established for the granting of the petition. In re Juvenile Appeal (84-BC), 194 Conn. 252,258 (1984); In re Karrlo K., 44 Conn. Sup. 101, 106 (1994), aff'd40 Conn. App. 73 (1996).
Termination of parental rights trials proceed in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established by clear and convincing evidence the existence of one or more of the statutory grounds as of the date the petition was filed or last amended. In re JuvenileAppeal, (84-AB), 192 Conn. 254, 264 (1984). In this case, the petition was filed on May 9, 2001 and the court therefore considers evidence pertaining to matters up to that date as relevant in the adjudicatory stage.
If at least one pleaded ground to terminate is found, the court proceeds to the disposition stage. The court must consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904 aff'd 35 Conn. App. 276,278, 648 A.2d 881, cert. denied, 231 Conn. 915, 648 A.2d 151 (1994). Inre Eden F., 250 Conn. 674, 688-89, 741 A.2d 873 (1999)." In re QuanitraM., 60 Conn. App. 96, 102, ___ A.2d ___ (2000).
I. FACTS
At trial, the petitioner introduced the social study, other documentary evidence, and the testimony of Ms. Marangelo, DCF social worker. Respondent, James P., testified on his own behalf and introduced documentary evidence. The child's attorney ;participated fully, but introduced no exhibits or testimony. The credible evidence admitted at trial supports the following facts by clear and convincing evidence:
Felicia B. was born on December 1993. Felicia has two older half-siblings, Zakeya and Tiquan B., and six younger half-siblings, with whom DCF has been involved. Felicia's mother, Keisha R., was on her own at the age of 12, when her mother became heavily involved with drugs. Keisha R. completed school through 10th grade and had her first child, Zakeya, when she was 16. CT Page 1175
There is a lengthy history of DCF involvement with this family. Initially, in February, 1994 when Felicia B. was about 2 months old, she and her older sister Zakeya (born 9-5-90) were removed from the home when DCF invoked a 96 hour hold on both children due to allegations of lack of supervision. The children were returned to their mother under an order of protective supervision on February 22, 1995, shortly after the birth of Kirk R., Jr. on January 19, 1995. In 1995, Keisha R. married Kirk R., Sr. Additional children were born in 1996 (Shawn R.), 1997 (Tiana R.), and 1998 (Joshua R.).[2] Throughout 1997 and 1998, DCF filed two motions for protective supervision on all the children. On September 14, 1998, DCF again invoked a 96 hour hold on behalf of Zakeya, Felicia, and Kirk R., Jr. These three children were adjudicated neglected or uncared for and committed to the care and custody of DCF on May 17, 1999. The issues in the home included domestic violence, physical abuse, lack of supervision and chronic neglect.
Numerous protective service referrals were received on children in the home dating from 1994 and continuing through 2001 alleging severe abuse and chronic neglect. The referrals were received from law enforcement, medical providers, homeless shelters, schools and other individuals. One referral made after a home visit by a DCF worker alleged that upon arrival for the home visit, the worker found the door off the hinges and the house ransacked, with furniture upside down and the parents screaming at each other.
There were many instances of substantiated neglect throughout DCF's history with this family, including instances where the children (or some of them) were left unattended. On another occasion, mother had left a homeless shelter with Zakeya, (then 5 years old), Kirk (1 year old) and Shawn (3 weeks old) to buy milk at 9:30 a.m. At 9:30 p.m., the Norwalk Police Department transported her and the children back to the shelter. She reported that she had not fed the children all day. Another referral from one of mother's friends stated that the children had no beds and only limited food in the home. On another occasion, a medical provider reported that as an infant, Shawn was brought to the emergency room by ambulance based on concerns that he had stopped breathing. After the hospital made the decision to admit the child overnight for observation, mother took the baby and left the hospital without permission. Two days later when mother brought the child back for cold symptoms, the doctor noted that the child still had a large plastic tube in his chest left over from the hospital and that the child had not been bathed.
Mother, Keisha R., voluntarily gave custody of another sibling, Tiquan B., (born 2-12-92) to her mother through the Probate Court when Tiquan was two years old. Tiquan was removed from that home on January 22, 1999 CT Page 1176 following reported incidents of physical abuse. On March 17, 1999, Tiquan was committed to DCF as a neglected child and has remained in DCF custody since that time.
After Zakeya and Felicia had been in DCF care, they disclosed that they had been sexually assaulted by their stepfather, Kirk R., Sr. Ultimately, criminal charges were brought against Kirk R., Sr., and his case proceeded to trial at which both Zakeya and Felicia testified. In December, 2000, he was convicted of two counts of Sexual Assault in the First Degree and two counts of Risk of Injury to a Minor. He was sentenced on April 6, 2001 to 40 years incarceration, suspended after 15 years to serve, to be followed by 35 years' probation. Mother, Keisha R., did not believe Zakeya and Felicia's testimony, ceased visitation with them after the trial and consented to termination of her parental rights as to both of them.
Felicia has many special needs as a result of neglect and abuse (including sexual assault) and has been in therapeutic foster homes since March, 1999. She receives intensive therapy, is currently on medication for Attention Deficit Hyperactivity Disorder and also receives special treatment at school where she has acted out sexually inappropriately many times. Her needs increased as a result of her testimony at the criminal trial during which she "relived" the sexual assault and she will continue to need on-going services for the foreseeable future. She was in one foster home for over two years. Unfortunately, that placement disrupted in May, 2001 and she was placed in another therapeutic foster home prior to trial.
Felicia does not know James P., her biological father, and views as her only father figure, Kirk R., Sr., her stepfather who was convicted of sexually assaulting her and her half-sister. Respondent father has been incarcerated for all of Felicia's life except for a 5 month period of time during which he was on parole and not permitted to leave the State of New Jersey. Respondent conceded that he did not seek permission to come to Connecticut during that five month period. He had no relationship with Felicia and did not see her during the time he was not incarcerated. Respondent father has seen Felicia B. once in her life, shortly after her birth when her mother brought her to the correctional institution in New Jersey where James P. was then incarcerated serving a three year sentence for aggravated assault. He has not seen Felicia B. since. He has never provided day-to-day care for her. He testified that in 1994, he learned that the State of Connecticut had taken custody of Felicia, but that he understood that the matter had been straightened out, that Felicia's mother was doing what was required and that there was "no need for [him] to come to Connecticut." Respondent did not make any effort to determine the status of his daughter in the State of CT Page 1177 Connecticut or to gain any information about the whereabouts and well-being of his child.
In April, 2000, a paternity test established James P. as Felicia's father. He then sent cards and letters to Felicia through DCF and undertook efforts to establish a relationship with his daughter. As of May 9, 2001, respondent father had sent four cards and letters to Felicia, one of which contained photographs. Although respondent requested telephone contact with Felicia, that request was denied.
Respondent father is currently incarcerated in New Jersey serving a sentence on armed robbery charges. He testified that he will be eligible to be released to a halfway house in April, 2002 and that he expects to remain there for a period of 18 months, making approximately October, 2003 the earliest date at which he would be in a position to provide a home for Felicia. He testified that his sister would be in a position to provide for Felicia prior to that time, but recognized that she did not have special skills to care for the special needs of Felicia. He acknowledged that while incarcerated he is not able to give Felicia a home or provide for her specialized needs on a day-to-day basis. Respondent father conceded that he had no parent-child relationship with Felicia, but stated that he loved his daughter and he wished to establish a parent-child relationship with her.
II. ADJUDICATION
Each statutory basis set out in General Statutes Section § 17a-112
(j) is an independent ground for termination. The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence. In re Baby Girl B., 224 Conn. 263, 618 A.2d 1
(1992).
A. Location and Reunification § 17a-112 (j)(1):
In order to terminate parental rights, DCF must prove, by clear and convincing evidence, the statutory element requiring "reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing . . . that such efforts are not appropriate." C.G.S. § 17a-112 (j)(1). "Although [n]either the word reasonable nor the word efforts is . . . defined by our legislature or by the federal act from which the requirement was drawn . . . [r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted; citation omitted.) In re Mariah S.,61 Conn. App. 248, 255, ___ A.2d ___ (2000). CT Page 1178
Respondent's principal claim at trial was that DCF failed to make any effort whatsoever to provide reunification services. He argues that after receiving the results of the paternity test, he made certain efforts under the circumstances to establish contact with his daughter, but DCF did not cooperate in those efforts and in effect, proceeded to file a termination petition.
While a respondent parent is imprisoned, DCF is generally excused from providing reunification services other than visitation. See generally Inre Roshawn R., 51 Conn. App. 44, 56-57, 720 A.2d 1112 (1998) (together with other factors, respondent's incarceration prevented DCF from providing reunification services). For a review of Superior Court cases applying this rule, see In re Destiny Q., Superior Court, Juvenile Matters, Child Protection Session, Docket No. U06-CP98-002230-A (Nov. 19, 2001, Levin, J.). Pursuant to C.G.S. § 18-81, the Commissioner of Correction is responsible for providing "treatment, vocational and academic education" programs to inmates incarcerated in Connecticut. Here, the respondent was incarcerated in New Jersey, making it significantly impracticable for DCF to provide services of any kind. "It is axiomatic that the law does not requires a useless and futile act." Inre Anthony B., 54 Conn. App. 463, 476, 735 A.2d 893 (1999). Because respondent has been incarcerated at all times, with the exception of one 5 month period, DCF was excused from providing reunification services other than visitation. In re Roshawn R., 51 Conn. App. at 57. Although respondent indicated his intention to seek visitation once he was released from custody, he had not been released or sought visitation at the New Jersey correctional facility as of May 9, 2001. (Respondent Ex. D). Other reunification efforts, such as telephone contact, would not have accomplished reunification where this child had seen her biological father once when she was an infant.
The Court finds by clear and convincing evidence it has been proved that respondent father is unable to benefit from reunification efforts.[3] By his own testimony, the earliest he could be released would be April, 2002 to be followed by 18 months at a halfway house. By virtue of the length of his incarceration in another state, and considering the emotional needs of this child, the respondent is unable to benefit from reunification efforts.
B. Failure to Rehabilitate — § 17A-112(j)(3)(B)(i)
The Court finds that the petitioner has established by clear and convincing evidence that respondent father James P. has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of CT Page 1179 the child, he could assume a responsible position in the life of his child, who was adjudicated neglected on May 17, 1999.
"`Personal rehabilitation as used in [Section 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to . . . to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.' (Citations omitted; internal quotation marks omitted). In re Eden F., [250 Conn. 674, 706, 741 A.2d 873
(1999)]. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved her ability to manage her own life, but rather whether she has gained the ability to care for the particular needs of the child at issue. (Internal quotation marks omitted). In reShyliesh H., [56 Conn. App. 167, 180, 743 A.2d 165 (1999)]." In re SarahAnn K., 57 Conn. App. 441, 448, ___ A.2d ___ (2000). See also In reAshley S., 61 Conn. App. 658, 665, ___ A.2d ___ (2001); In re AmnerisP., 66 Conn. App. 377, 384-85, ___ A.2d ___ (2000).[4]
By virtue of his incarceration in another state, James P. has been unable to bring himself into a position in which he could provide adequate care for this child with special needs. Respondent father conceded that he was not in a position to provide adequate care for Felicia and would not be in such a position until at least October, 2003. There was no evidence that even then respondent would be in a position to meet the particular specialized needs of this child who will need long term consistent care in addressing the issues for which she requires intensive therapy and medication. Thus, the court finds by clear and convincing evidence that respondent father has not brought himself into a position in which he can provide adequate care for Felicia.
Rehabilitation must be foreseeable within a reasonable time. In reSheila J., 62 Conn. App. 470, 479-80 (2001). Here, the respondent was no better able to care for his daughter as of the adjudicatory date than he was when Felicia came into DCF's care. Thus, the court finds by clear and convincing evidence that respondent father has not brought himself into a position in which he can provide adequate care for Felicia and such rehabilitation is not foreseeable within a reasonable time.
C. No Ongoing Parent-child Relationship — § 17A-112(j)(3)(D):
This ground is established when there is no ongoing parent-child relationship with the parent, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing CT Page 1180 day to day basis the physical, emotional, moral and educational needs of the child and where allowing further time for the establishment of the parent-child relationship would be detrimental to the best interest of the child.
No ongoing parent-child relationship contemplates a situation in which, regardless of fault, a child either has never known their parent, or that no relationship has ever developed between them, or that the child has lost that relationship so that despite its former existence it has now been completely displaced. In re Juvenile Appeal (Anonymous),181 Conn. 638, 645-46 (1980); In re John G., 56 Conn. App. 12, 22,740 A.2d 496 (1999). In any case, "the ultimate question is whether the child has no present memories or feelings for the natural parent." In reJuvenile Appeal, (Anonymous), 177 Conn. 648, 670 (1979). The mere recognition of an individual as a parent will not defeat this ground. Inre Juvenile Appeal (84-6), 2 Conn. App. 705, 708-09 (1984), cert.denied, 195 Conn. 801 (1985). The presence or absence of positive feelings on the part of the child is determinative. In re Shane P.,58 Conn. App. at 240.
In the adjudicatory phase, the petitioner must establish (1) that no ongoing parent-child relationship exists; and (2) that the allowance of further time for the establishment of such a relationship would harm the interests of the child. In re Jonathan G., 63 Conn. App. 516, 525
(2001).
The Court finds by clear and convincing evidence that there is no ongoing parent-child relationship between the child Felicia and respondent father. Prior to April, 2000, and for the first six and a half years of Felicia's life, respondent father did nothing to establish a parent-child relationship with Felicia. During the one year period after paternity was determined in April, 2000 and prior to the filing of the petition, respondent father did send some letters in an effort to establish a relationship with his daughter. However, a handful of letters sent to a child who does not know him and who has been in a therapeutic foster home after having been subjected to neglect and abuse, is not sufficient to establish a parent-child relationship. Respondent father conceded that he did not have a parent-child relationship with Felicia, although he wished to establish one. Felicia does not recognize James P. as her parent in that she would not seek comfort from him or go to him to have her needs met. She has seen her biological father once, when she was only a few weeks old and has no present memories of him. Although respondent father is well-intentioned to the extent that he expresses his love for his daughter and a desire to care for her when he can, the fact remains that he has not been a part of her life since birth. As a result of his own criminal conduct, which led to his lengthy incarceration, CT Page 1181 respondent father has rendered himself unavailable to serve as a parent for Felicia. See In re Shane P., 58 Conn. App. 234, 241 (2000). Even when he was not incarcerated, he did not make efforts to establish a parenting relationship with Felicia. Respondent father has never met on a day to day basis the physical, emotional, moral or educational needs of this child. In re Jonathan G., 63 Conn. App. 525..
The court further finds by clear and convincing evidence that to allow respondent father further time for the establishment of a parent-child relationship with a daughter who does not know him would be detrimental to the best interest of Felicia. She is now 8 years old and suffering from the effects of having been sexually assaulted by her stepfather. She has been in therapeutic foster homes since 1999. The only father figure she has ever known is her stepfather who was convicted of sexually assaulting her. By his own testimony, respondent father will be unable to provide for Felicia until approximately October, 2003. In view of Felicia's needs, it would be detrimental to her to allow this substantial amount of time in which respondent father could attempt to develop a parent-child relationship.
Thus, the Court finds that the petitioner has proven both statutory grounds for termination as to respondent James P. by clear and convincing evidence.
III. DISPOSITION
As to the dispositional phase of this hearing on the petition for termination of parental rights, the court has considered the evidence and testimony related to circumstances and events up to and including November 1, 2001, the date upon which the evidence in this matter was completed. "`If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child.' In re Eden F.,250 Conn. 689]." In re Quanitra M., 60 Conn. App. 103. "In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [17a-112
(k)]." In re Jonathan G., 63 Conn. App. 516, 528 (quoting In re DenzelA., 53 Conn. App. 827, 833, 733 A.2d 298 (1999)). "The seven factors . . . serve simply as guidelines to the court and are not statutory prerequisites that need to be proven before termination can be ordered."In re Quanitra M., 60 Conn. App. at 104. The court considers each of them in determining whether to terminate parental rights under this section. The court makes the following seven written findings:
(1) As to the timeliness, nature and extent of services offered, CT Page 1182 provided and made available to the parent and the child by an agency to facilitate the reunion of the child with respondent, the court finds by clear and convincing evidence that services were not offered due to respondent's incarceration in another state and that James P. was unable to benefit from reunification efforts.
(2) As to whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, the court finds by clear and convincing evidence that James P. has demonstrated that he is unable or unwilling to benefit from reunification efforts. C.G.S. § 17a-112 (c)(1). The action of DCF to institute termination proceedings is consistent with the federal law designed to eliminate foster care drift and secure permanent placement for children in foster care.
(3) As to the extent to which all parties have fulfilled their obligations under the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, the court finds that no specific steps were ordered as to respondent father as he was unable to benefit from reunification efforts. DCF has fulfilled any obligations it had in order to facilitate reunification of the family.
(4) As to the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties, the court finds by clear and convincing evidence that Felicia does not have any bond with respondent father and does not know him. He has been incarcerated in another state for all but five months of Felicia's life. During that five months he had no contact with her. She has no memories of him and does not recognize him as a parent in the sense that she would not seek comfort from him or go to him to have her needs met.
The only feelings she has for her stepfather are negative as he has been convicted of sexually assaulting her and her older sister.
Her mother voluntarily ceased all visitation with her and consented to termination of her parental rights after Felicia testified against her mother's husband, Mr. R., at the criminal trial. Felicia does have present memories of her mother and feelings for her. She has indicated that although she does not wish to live with her, she would like to have visitation with her mother once in a while.
Felicia had strong emotional ties with the foster parents with whom she lived from March 1999 through May, 2001. The evidence revealed that she CT Page 1183 had adjusted well in that foster family and that the foster parents provided the physical, emotional and educational support she needed. However, in May, 2001, after Felicia had testified in the sexual assault case, that foster placement disrupted through no fault of Felicia's. Felicia was placed in a new therapeutic foster home.
(5) As to the age of the child, the court finds that Felicia is now 8 years of age. The Court further finds, as shown by clear and convincing evidence, that this child requires stability of placement and continuity of care and that the child's attorney recommends termination.[5]
(6) As to the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; the court finds by clear and convincing evidence that respondent father has attempted to establish contact with the child, which has not been possible given his incarceration in another state. As a result, father has maintained very limited contact, sending cards and letters sent since April, 2000. He had no contact with Felicia prior to that date with the exception of one visit when Felicia was only a few weeks old. The court further finds that in view of his incarceration, respondent has been unable to make realistic and sustained efforts to conform his conduct to even minimally acceptable parental standards. Giving him additional time would not likely bring his performance, as a parent, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C. 210 Conn. 157
(1989); In re Juvenile Appeal, 183 Conn. 11, 15 (1981). This is particularly true here where respondent father's own testimony established that he could not provide for Felicia until 2003 at the earliest.
(7) As to the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent, the court finds by clear and convincing evidence that no unreasonable conduct by the child protection agency, foster parents or third parties is noted. DCF took steps to locate father and confirm his paternity. The respondent claims that Felicia's mother unjustly withheld information from him concerning her and the child's whereabouts and refused to bring the child to see him in New Jersey even though he made that request. He speculated that Kirk R., Sr., Keisha R.'s husband, did not want Keisha R. CT Page 1184 or Felicia to have contact with James P. Despite these protestations, however, James P. did receive information when the child was initially removed from the home and placed in foster care. According to his own testimony, he assumed that the situation was "straightened out" and that there was "no need for him to come to Connecticut." He did not make any efforts at that time to determine the exact status of his child in the State of Connecticut or to gain any information whatsoever about the whereabouts and well-being of his daughter. Moreover, it was the respondent's own criminal conduct that resulted in his incarceration in New Jersey.
Further, while the respondent's financial means were limited, economic factors did not prevent regular, continuing contact with the child. He did provide some letters and cards through DCF to Felicia. No unreasonable conduct by the child protection agency is noted.
With respect to the best interests of the child contemplated by C.G.S. § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, the court finds that termination of the parental rights of James P. is in the best interest of the child Felicia B. Permanency, consistency and stability are crucial for Felicia. She has severe special needs which will require consistent, responsible attention. She has already endured a change in placement. James P., while well intentioned at the time of trial, has consistently failed to assume a responsible parental role regarding Felcia. After considering the child's sense of time, her need for a secure and permanent environment, the need to avoid future disrupted placements, the lack of any relationship whatsoever with respondent, and the totality of circumstances occurring since 1994, the court concludes that termination of parental rights of respondent father is in Felicia's best interest.
The court also finds that termination of the parental rights of respondent mother, Keisha R., to Felicia B. based on mother's consent is in the best interest of the child. Respondent mother voluntarily ceased visitation and consented to termination after the criminal trial. This finding is made after considering the totality of circumstances including the child's sense of time and the child's need for a secure and permanent environment.
It is accordingly, ORDERED that the parental rights of James P. and Keisha R. are hereby terminated as to the child Felicia B. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent for Felicia B. for the purpose of securing an adoptive family or other permanent placement for the child.
A permanency plan shall be submitted within 30 days of this judgment, CT Page 1185 and that such further reports shall be timely presented to the court as required by law.
Judgment may enter accordingly.
It is so ordered this 30th day of January, 2002.
____________________ Jongbloed J.