## IN RE JONATHON G.*
### (AC 20939)

Foti, Spear and Hennessy, Js.

Argued March 21—officially released May 22, 2001

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Thomas S. Becker*, for the appellant (respondent father).

*Jose A. Suarez*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Opinion*

FOTI, J. The respondent father[1] appeals from the judgment of the trial court terminating his parental rights with respect to his son. On appeal, the respondent claims that the court's conclusions that he had abandoned his son and that there was no ongoing parent-child relationship were not legally correct and factually supported. The respondent also claims that the court's factual findings pursuant to General Statutes (Rev. to 1999) § 17a-112 (d), now (k), were not supported by the record. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to this appeal. In 1998, the commissioner of the department of children and families (department) filed a neglect petition, alleging that the respondent's child was uncared for and homeless, and that the specialized

---

[1] On March 31, 2000, the child's mother consented to the termination of her parental rights with regard to her son. As only the respondent father has appealed, we refer to him in this opinion as the respondent.

care that the child required as a result of his physical, emotional or mental condition could not be provided in his home. He was committed to the care and custody of the department and, in 1999, the court ordered that continuing efforts for reunification were no longer appropriate with regard to both parents. Thereafter, the department filed a petition for the termination of the parental rights of the child's mother and of the respondent. As to the respondent, the petition alleged that he had failed to achieve sufficient personal rehabilitation, that he lacked an ongoing parent-child relationship with his son and that he had abandoned his son.

In a comprehensive memorandum of decision, the court set forth the following facts. "In 1990, [the child's mother and father] became involved in a relationship that lasted for eight months. Their relationship was volatile and marred by domestic violence. [The respondent father] also had problems with [the mother's] family. On at least one occasion, he threatened to kill all of them and on another occasion he held a knife to [the mother's] little sister's throat. As a result of this behavior, [the child's maternal grandmother] obtained two restraining orders restricting [the respondent father's] contact with the family.

"In January of 1991, at the same time that [the child's mother and father] were in the process of breaking up, [the mother] learned that she was pregnant. [The child's mother and father] ended their relationship in the winter of 1991. [The child's maternal grandmother] testified that during one of the restraining order hearings, [the respondent father] asked that the order not be entered because he would miss the birth of his child.

"[The child] was born on August 31, 1991. At the time of [the child's] birth, [the respondent father] was attending Army boot camp in Georgia. While there, he received a certified letter informing him that [the

mother] had a child and that she was claiming that he was the father. [The respondent father] did not respond to this letter. While [he] had some doubts as to whether he was the father, he was clearly on notice that he might be as of the summer of 1991.

"When [the child] was born, [his mother] initially decided to give him up for adoption. However, [the child's paternal grandmother] told [the mother's] family that she did not want the child given up for adoption and that she wanted him to stay in the family. At that point, [the child's maternal grandmother] decided that she would help [the mother] take care of the child. [The child's maternal grandmother] invited [the child's paternal grandmother] to visit with [the child] while he was still a baby. [The child's paternal grandmother] explained to [the child's maternal grandmother] that she did not want to see the child until a paternity test confirmed that he was [the respondent father's] son. [The child's paternal grandmother] also had an attorney send the mother a letter requesting visitation if a test confirmed that the child was her grandchild. When she received no response to this letter, neither she nor her son took any action in court to assert parental rights or took any steps to have a paternity test performed.

"On December 15, 1994, [the child's maternal grandmother] obtained guardianship of [the child] through the Probate Court because [the mother] was having psychiatric problems and [the child] was being abused by [the mother's] boyfriend. He had repeatedly assaulted the child who was only two years old.

"In February of 1997, [the mother] went back to Probate Court and obtained temporary custody of the child. [The child's maternal grandmother] objected to the child being returned to [the mother] because [the mother] had not received any counseling for her problems and was now involved in an unsafe relationship

with [another boyfriend]. After the child was returned to his mother, [the child's maternal grandmother] tried to keep [the child] safe by taking the child to her house on the weekends and several times during the week. However, while living with his mother, [the child] was severely abused by [the mother's then boyfriend], including being punched and kicked in the stomach.

"In December of 1997, [the child's maternal grandmother] went back to Probate Court and was again given guardianship of [the child].

"When [the child] was returned to his maternal grandparents, he needed counseling for the abuse and neglect he had suffered at the hands of his mother and her boyfriends. In December of 1997, [the child] was enrolled in the Apple Valley Partial Hospitalization Program because of his severe aggression and hyperactivity. He was diagnosed with posttraumatic disorder and depressive disorder.

"On January 24, 1998, [the child] was hospitalized at Elmcrest Psychiatric Hospital for his behavioral problems. He was discharged after one week and then immediately rehospitalized because the maternal grandparents did not feel they could keep him safe because of his uncontrollable behavior. He was then hospitalized at Elmcrest from January 30, 1998, until March 24, 1998.

"On February 13, 1998, [the department] obtained an order of temporary custody for [the child] because [the child] was still engaging in rages and the maternal grandparents did not feel they could keep him safe. At the time that the [order for temporary custody] was filed, however, the plan was for the maternal grandparents to care for [the child] after he received appropriate care and had stabilized.

"When [the child] was discharged from Elmcrest, [the department] placed him at the home of his maternal

grandparents and he attended the Elmcrest intensive outpatient program. [The child] was treated by Russell Harrington, a therapist with Elmcrest, between the fall of 1998 and May of 1999. While Harrington was treating [the child], he discussed the concept of a biological father [with the child] on several occasions. [The child] had no memories of his father and indicated that he had no interest in meeting him or having him as part of his life.

"Between June, 1998, and July, 1998, [the child] was admitted to [the Hospital of Saint Raphael] because of his disruptive behavior. He was then placed at Curtis Home between September of 1998 and February of 1999. Because he was repeatedly running away and was constantly bruised, he was returned to his maternal grandparents in February of 1999, where he has resided through the time of trial.

"Since March of 1999, [the child] has attended the Wheeler Clinic program for treatment. Since September of 1999, he has received individual counseling from psychologist Susan Harrington at Wheeler. He has been diagnosed with major depressive disorder, oppositional defiant disorder and attention deficit hyperactivity disorder. [The child] has a negative view of himself as different, damaged and inherently defective.

"As a result of his treatment at Wheeler Clinic, [the child's] behavior has improved. He is still, however, a very ill little boy. While it was initially necessary to constantly put him into restraints for his outbursts and tantrums, these behaviors have lessened over time. As recently as March of this year, however, 911 had to be called because [the child] was out of control and in danger of hurting himself or those around him. Susan Harrington testified that [the child] is not yet at the point where he can internally control his emotional outbursts. She also testified, however, that she is hope-

ful for this child because he does have an ability to form attachments and he is an intelligent child. She has worked closely with [the child] and his maternal grandparents for the last year. Susan Harrington has found that [the child] feels loved, safe and attached to his grandparents. [The child's] maternal grandfather goes camping and fishing with [him] and participates in Boy Scouts with him. Both maternal grandparents have been highly involved in [the child's] treatment. Susan Harrington testified that she believes that [the child's] maternal grandparents can meet his special needs.

"Susan Harrington has also discussed the concept of a biological father with [the child]. He views fathers as bad men who hurt people. He was very disturbed by the concept of all children having a biological father even if they have not seen him. Susan Harrington found that [the child] has no memories of his biological father.

"Prior to 1995, [the respondent father] never made any attempts to see [the child]. In 1995 or 1996, [the respondent father] did see [the child] twice at [the invitation of the child's maternal grandmother]. He took the child shopping and gave him several presents, including his watch. He told his mother at that time that he was interested in having a paternity test and in taking care of his child. He did not, however, take any action at this point to confirm his paternity.

"In December of 1996, [the respondent father] was arrested for an incident in which he was intoxicated and ran over another individual. In December of 1997, he was convicted on two counts of reckless endangerment and one count of assault [in the second degree]. He was sentenced to serve one year in jail.

"While incarcerated, [the respondent father] was contacted by [the department] because [the mother] had named him as the putative father in the neglect/uncared

for proceedings. As part of these court proceedings, [the respondent father] had a paternity test done that confirmed that he was the father of [the child]. In April of 1998, [the respondent father] finally acknowledged paternity of [the child] who was now six years old.

"In May of 1998, [the respondent father] submitted to a court-ordered psychological evaluation of his current personality functioning to aid in determination of his ability to parent [the child]. Anne Phillips, a clinical psychologist, found that [the respondent father] did not display a capacity for separate understanding of others or for anticipating the extensive and complicated needs of his son.

"On August 19, 1998, the court ordered that [the child's] therapist, Russell Harrington, would have to approve any contact between [the child] and [the respondent father]. [The respondent father] did contact Russell Harrington to see if he could have a visit with [the child] and the therapist. Russell Harrington told [the respondent father] that he would have to come in and meet with him individually before he would consider his meeting [the child]. [The respondent father] refused to do this. [The respondent father] subsequently told [the department] that he considered psychology 'a crock' and Russell Harrington a 'sicko.' After [the respondent father] contacted Russell Harrington about visitation, Mr. Harrington recommended that visitation not occur because it would not be in the child's best interest.

"At around the same time that the [termination of parental rights] papers were filed, [the respondent father] started sending support payments for [the child]. He also attended a number of different parenting classes.

"On April 19, 2000, [the respondent father] arranged to have a psychological evaluation performed by psy-

chologist Bruce Freedman. [The respondent father] admitted to Freedman that he might have tried to avoid responsibility or awareness that he had a child. Without seeing the child, Freedman recommended that [the respondent father's] parental rights not be terminated."

We begin our discussion by noting that "[t]he hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether the statutory ground for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether the termination of parental rights is in the best interests of the child. *In re Maximina V.*, 44 Conn. App. 80, 82–83, 686 A.2d 1005 (1997)." (Citation omitted; internal quotation marks omitted.) *In re Drew R.*, 47 Conn. App. 124, 127, 702 A.2d 647 (1997).

"The standard for review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. *In re Luis C.*, [210 Conn. 157, 166, 554 A.2d 722 (1989)]; *In re Christina V.*, 38 Conn. App. 214, 223, 660 A.2d 863 (1995)." *In re Eden F.*, 48 Conn. App. 290, 309, 710 A.2d 771 (1998), rev'd on other grounds, 250 Conn. 674, 741 A.2d 873 (1999). "On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id.

I

The respondent claims that the court's conclusion that there is no ongoing parent-child relationship is not

legally correct and factually supported by the record. We do not agree.

General Statutes (Rev. to 1999) § 17a-112 (c) (3) (D), now (j) (3) (D), provides that the court may grant a petition to terminate parental rights if it finds by clear and convincing evidence that "there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child . . . ."

"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop. . . . In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. See *In re Michael M.*, [29 Conn. App. 112, 129, 614 A.2d 832 (1992)]; *In re Megan M.*, [24 Conn. App. 338, 341, 588 A.2d 239 (1991)]. The ultimate question is whether the child has no present memories or feelings for the natural parent. *In re Jessica M.*, [217 Conn. 459, 468, 586 A.2d 597 (1991)]; *In re Juvenile Appeal (84-6)*, [2 Conn. App. 705, 708–709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985)]. Feelings for the natural parent connotes feelings of a positive nature only. *In re Jessica M.*, supra, 469; *In re Juvenile Appeal (84-6)*, supra [709]. *In re Kezia M.*, 33 Conn. App. 12, 20–21, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993)." (Citations omitted; internal quotation marks omitted.) *In re Tabitha T.*, 51 Conn. App. 595, 601–602, 722 A.2d 1232 (1999).

The evidence before the court was sufficient to support the conclusion that the child has no present memories of or feelings for the respondent. In addition to finding that the child "has no memories of [the respondent]," the court found that "because of the abuse that this child has suffered at the hands of [his mother's] various boyfriends, he views fathers as mean people who hurt other people." The feelings of the child are most important in determining whether a parent-child relationship exists. *In re Savanna M.*, 55 Conn. App. 807, 815, 740 A.2d 484 (1999). The court properly weighed the evidence, including expert testimony, to conclude as it did.

The court also found by clear and convincing evidence that it was not in the child's best interest to allow further time to establish a parent-child relationship. The record discloses that the child is a very emotionally fragile nine year old who suffers from several disorders. He is a child who has never known his father, has bonded with his maternal grandparents and is making progress with them. The respondent, on the other hand, is unable to understand the child's special needs. In considering those factors, the court also properly weighed the child's strong need for permanency and concluded that it was not in the child's best interest to allow further time to establish a relationship with the respondent. On the basis of the evidence before the court, we cannot disturb its findings.

II

The respondent also argues that the court improperly concluded that he had abandoned his son.

In part I, we concluded that the court properly found that there was no ongoing parent-child relationship between the respondent and the child.

We need only uphold one statutory ground found by the court to affirm its decision to terminate parental

rights. *In re John G.*, 56 Conn. App. 12, 20 n.4, 740 A.2d 496 (1999). "To prevail on [his] claim that the court improperly terminated [his] parental rights, the respondent must successfully challenge all of the bases of the judgment terminating [his] parental rights. If [any] of the grounds on which the trial court relied are upheld on appeal, the termination of parental rights must stand." (Internal quotation marks omitted.) Id. Accordingly, because we concluded that the court properly determined that one statutory ground for termination exists, namely, lack of an ongoing parent-child relationship, we need not reach the respondent's claim that the court improperly found that the respondent had abandoned the child.

## III

The respondent claims that the court's factual findings as to the factors enumerated in § 17a-112 (d),[2] now (k), were not supported by the record. We do not agree.

[2] General Statutes (Rev. to 1999) § 17a-112 (d), now (k), provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the parents' parental rights is not in the best interest of the child. In arriving at that decision, the court is mandated to consider and make written findings regarding seven factors delineated in General Statutes [§ 17a-112 (d), now (k)]." *In re Denzel A.*, 53 Conn. App. 827, 833, 733 A.2d 298 (1999).

Those seven factors, considered in the dispositional phase, are not a prerequisite to the issuance of an order terminating parental rights. *In re Quanitra M.*, 60 Conn. App. 96, 104, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). Proof by clear and convincing evidence of the seven factors prior to the finding by the court that it is in the best interest of the child to terminate the respondent's parental rights is not required. Id., 105.

Although the respondent argues to the contrary, the court considered those factors and made the mandatory findings in its memorandum of decision. Although the respondent is not pleased with the court's findings and the manner in which the court made them, we may not usurp the court's function. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 65, 699 A.2d 101 (1997). The probative force of conflicting evidence is for the trier to determine and our function as an appellate court is to review and not

the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

to retry the matter. *In re Ashley E.*, 62 Conn. App. 307, 316, 771 A.2d 160, cert. denied, 256 Conn. 910, 772 A.2d 601 (2001).

We conclude that sufficient evidence in the record supports each of the court's findings. We find it unnecessary to discuss and analyze each of the court's findings concerning the statutory factors.

The judgment is affirmed.

In this opinion the other judges concurred.