MEMORANDUM OF DECISION
This memorandum of decision addresses petitions to terminate the parental rights (TPR) of Sabrina W., the biological mother of Aleese W., born November 1995;[2] Billie F., born February 1997; and Ba-Shan W., born September 1998. The memorandum of decision also addresses petitions to terminate the parental rights of Billy F., the biological father of Billie and Ba-Shan. The operative TPR petitions against Sabrina W. alleges the grounds of fail are to rehabilitate, and failure to rehabilitate when her parental rights to other children were previously terminated. The operative TPR petitions against Billy F. allege the grounds of abandonment and lack of an ongoing parent-child relationship. For the reasons stated below, the court finds these matters in favor of the petitioner. CT Page 7312
The Department of Children and Families (DCF) first obtained custody of Aleese through an Order of Temporary Custody (OTC) entered in January 1996. In July 1996, the court found Aleese to be neglected and uncared for, and returned her to Sabrina W.'s care under protective supervision. In January 1998, DCF obtained custody of Aleese and Billie through a second OTC: the sisters were adjudicated neglected in October 1998, but were subsequently returned to their mother's care. In May 2000, an OTC was ordered for Aleese, Billie and their brother Ba-Shan. All three children have remained in DCF custody since that date, pursuant to court orders. On November 8, 2000, the children were adjudicated neglected and uncared for.
The original TPR petitions were filed against Sabrina W. and Billy F. on April 10, 2001: these petitions specified that Sabrina W. was an inmate residing at York Correctional Institution (York CI). On April 30, 2001, amended petitions were submitted, correctly specifying Sabrina's address at a community-based corrections facility in Hartford, but without making any substantive changes in the TPR petitions or the supporting factual allegations.
Trial of this highly-contested matter took place on April 1 and 12, 2002. The petitioner, the respondent mother, and the children were vigorously represented throughout the proceedings. Sabrina W. was in attendance throughout, but Billy F. made no appearance.[3]
The Child Protection Session of the Superior Court, Juvenile Matters, has jurisdiction over the pending matters. Notice has been provided in accordance with the applicable provisions of the Practice Book. No action is pending in any other court affecting custody of the children at issue.
 I. FACTUAL FINDINGS
The Court has thoroughly reviewed the verified petitions, the TPR social study and addendum,[4] and the multiple other documents submitted in evidence, which included photographs, reports of DCF and communications from service providers, a criminal history, records of incarceration, court orders, hospital and laboratory records, police reports, a curriculum vitae, psychological report, education records and certificates of achievement. The court has utilized the applicable legal standards[5] in considering this evidence and the testimony of trial witnesses, who included DCF staff members, a psychologist, a therapist, a probation officer, a police officer, the foster mother, substance abuse treatment workers, and the respondent mother. Upon deliberation, the court finds that the following facts were proven by clear and convincing CT Page 7313 evidence at trial:
I.A. EVENTS PRIOR TO THE NEGLECT ADJUDICATION OF NOVEMBER 8, 2000
Sabrina W. was born on August 15, 1967. She has no contact with her family of origin. Sabrina W. attended school through the eleventh grade, obtained her GED in 1989, worked with the Job Corps. She worked as a Certified Nurse's Aide (CNA) performing private duty and in-home services up until 1996. (Exhibit 1.)
Sabrina W. met Marvet S. in 1993: their child Aleese was born on November 1995. In 1996, Sabrina W. met Billy F. Their daughter Billie was born on February 1997, and their son Ba-Shan was born on September 1998. Sabrina W. and Billy F. maintained their relationship until 1998, but she has not seen him since.
The respondent's history of substance abuse dates back to 1990: she has identified crack cocaine as her "drug of choice." (Exhibits 1, 12.) Sabrina W.'s contact with the criminal justice system commenced in 1990,[6] when she was convicted of Larceny in the sixth degree and failure to appear in the second degree. Over the past decade, she has been convicted on a number of occasions for violation of court orders. On May 19, 1992, Sabrina W. was again convicted of Larceny in the sixth degree and failure to appear in the second degree, along with Risk of Injury to a minor, and was placed on probation. (Exhibit 3.)
Sabrina W. has been known to DCF since 1991. She gave birth to her son Malcolm in May 1991 and to her second son Urich in March, 1992. Both children had been exposed to cocaine in utero, were left unattended by Sabrina W. on at least one occasion, and were adjudicated neglected or uncared in a prior proceeding. On August 12, 1993, the court (Levin, J.) terminated Sabrina W.'s parental rights to both Malcolm and Urich, finding that she had abandoned the children, had failed to achieve rehabilitation, had denied them care and guidance by reason of her act or acts of commission or omission, and that there was no ongoing parent-child relationship with either boy. (Exhibits 1, 14, 15; Testimony of Charlotte S.)
At Aleese's birth in November 1995, Sabrina W. was intoxicated and the child tested positive for cocaine.[7] (Exhibit B.; Testimony of Charlotte S.) In January 1996, DCF obtained an OTC for Aleese and the child was placed in foster care while Sabrina pursued treatment. On July 19, 1996, Aleese was adjudicated neglected and uncared for, but was returned to Sabrina W.'s care under protective supervision. (Exhibits 1, 5.) At DCF's referral, the Intensive Family Preservation (IFP) program sponsored by Hall Neighborhood House, Inc. provided services to Sabrina CT Page 7314 W. from September 23, 1996 through mid-February 1997. Sabrina W. was initially compliant with the IFP program, demonstrating good parenting and homemaking skills. When Sabrina W. became inconsistent in her cooperation with the program, focusing on her companion Billy F. instead of addressing her children's needs, IFP closed the case. (Exhibit 5.)
Sabrina W. continued to use cocaine during the course of her next pregnancy. When Billie was born in February 1997, both mother and infant tested positive for cocaine. During the following months, while Sabrina W. was the primary caretaker for both Aleese and baby Billie, the respondent cooperated to a degree with the substance abuse and parenting services provided by DCF. She participated in the Regional Network Program (Regional), an intensive process of individual counseling for substance abuse and depression issues, although she did not fully comply with the program requirements. She attended the ECAR (Empowering Children at Risk) program which provided substance abuse treatment and screening, parenting education, and day care for the children who accompanied her to sessions. (Exhibit A; Testimony of Charlotte S.) Notwithstanding these services, by April of 1997, Sabrina W. was encountering financial difficulties, faced eviction, and had trouble maintaining her sobriety. (Testimony of Charlotte S.)
On July 9, 1997, Sabrina was rearrested in connection with the Risk of Injury charges that originated in 1992. She was held at York CI until July 24, 1997, when she was convicted of violation of probation, receiving an unspecified sentence. (Exhibits 3, 4.) Her daughters were temporarily placed in foster care, but were returned to Sabrina W.'s custody upon her discharge from the DOC.[8] (Testimony of Charlotte S.)
Sabrina W. secured another apartment and moved there with the girls. She was still involved in treatment but struggled with sobriety, and occasionally was unable to attend substance abuse sessions because of transportation difficulties. However, no extant neglect or abuse issues were apparent to DCF. In recognition of the parenting skills she was apparently able to demonstrate, DCF closed its case on October 14, 1997. (Exhibit A; Testimony of Charlotte S.)
Three months later, on January 19, 1998, Sabrina W. was arrested and again charged with Risk of Injury to a minor, after leaving Aleese and Billie alone and unattended.[9] (Exhibits 3, B; Testimony of Cecelia M.) On that date, DCF executed a 96-hold, and an OTC was sustained by the court on January 23, 1998. Sabrina was released on pre-trial electronic monitoring with the condition that she attend the Project Concern program. (Exhibits 1, B; Testimony of Charlotte S.) CT Page 7315
Sabrina W. did not satisfactorily comply with the conditions of release. On April 16, 1998, the court transferred her to Community Solutions, Inc. (CSI), a residential alternative-to-incarceration placement substance abuse treatment facility. While residing at the CSI program, Sabrina W. attended twelve weeks of intensive substance abuse therapy at the Morris Foundation (MF) and six weeks of relapse prevention. She also regularly attended AA/NA meetings, and participated in CSI's group sessions dealing with parenting, substance abuse and relapse prevention, anger management, and other subjects. Sabrina W. remained substance free while living at the CSI center. (Exhibits 5, 6, D[1, 4].) Overnight visits with her daughters were provided by DCF. (Testimony of Cecelia M.) On August 13, 1998, while in residence at CSI, Sabrina W. was convicted of Reckless Endangerment, substituted for the pending Risk of Injury charge. She was again placed on probation, and continued in residence at CSI. (Exhibits 3, 4.)
On September 1998, Sabrina W. gave birth to Ba-Shan W. at a local hospital. Initial laboratory reports erroneously indicated that the infant was positive for cocaine upon delivery, leading DCF to assume his custody: the infant was returned to Sabrina W.'s care at the CSI program on October 15, 1998, after the error had been discovered. (Exhibits 6, B.)
On October 15, 1998, Aleese and Billie were adjudicated neglected and were committed to DCF (Rogers, J.). (Exhibit 1.) On that day, the court ordered specific steps for Sabrina W. to follow, obliging her to avoid further involvement with the criminal justice system; remain substance free; successfully complete substance abuse treatment and follow recommendations regarding after care treatment and relapse prevention; and participate in individual, parenting and family counseling so she could understand the deleterious effects of her substance abuse upon her parenting, and make appropriate decisions to keep the children safe.[10]
(Exhibit 10.)
On February 1, 1999, Sabrina W. successfully finished the residential portion of the CSI program. With Ba-Shan, she then moved into an off-premises apartment that had been located through CSI. She was generally compliant with CSI's program of follow-up life skills and parenting groups, and rendered urine specimens for drug and alcohol screening. (Exhibits B, D[3].) In December 1998, Sabrina W. began individual counseling with Merle J., a licensed clinical social worker at Catholic Family Services (CFS), to address maintaining her sobriety and understanding how her substance abuse affects her children. (Exhibits B, E.)
In April 1999, Sabrina W. renewed CNA training through Now, Inc. CT Page 7316 (Exhibits B, D[6].) In May 1999, DCF began permitting Aleese and Billie to spend weekends at the apartment with Sabrina W. and Ba-Shan. (Testimony of Cecelia M.)
On September 23, 1999, DCF referred Sabrina W. to the Boys Village In-Home Service (Boys Village) program "in order to provide the family with reunification services." (Exhibit 8.) With these services and counseling in place, Aleese and Billie were returned to Sabrina W.'s care in October 1999. (Exhibit B; Testimony of Cecelia M.) Sabrina W. followed through with the parenting skills portion of the Boys Village program and improved in a number of fundamental areas, although "she was not always available for the team's weekly home visits." (Exhibits 8, B.) When Boys Village ended its services on February 25, 2000, the agency found the family's prognosis to be only "fair due to Sabrina's reluctance to continue seeking support services for her substance abuse issues."[11]
(Exhibit 8.)
The concern of the Boys Village staff was well founded, as Sabrina W. continued to abuse alcohol, notwithstanding the counseling and long-term treatment she had received at CSI. On February 15, 2000, Sabrina W. was involved in an altercation with a male companion. The respondent's intoxication was apparent in the emergency room, and she admitted to drinking at the time of the incident. Although hospital personnel advised Sabrina W. that she had sustained a fracture of the mandible, she refused a consultation with a specialist, and "signed out against medical advice." (Exhibit 7.)
Notwithstanding this incident, at the end of March 2000, DCF closed Sabrina W.'s file for a second time, having determined that the level of "[c]urrent risk in the home is low." (Exhibit B.) DCF recommended that Sabrina W. attend substance abuse support meetings in the community and refrain from the use of alcohol or drugs. (Exhibit B; Testimony of Cecelia W.) Sabrina W. again renewed her efforts at being re-certified as a nurse's aid, and received her certificate of completion from a local vocational school on May 5, 2000. (Exhibits B, T.)
Days later, on May 24, 2000 Sabrina W. was involved in another altercation, this time involving her boyfriend, Rodney B. This incident occurred in the apartment where they cohabited, in close proximity to all three children. Again intoxicated, Sabrina W. became angry and threw a television, pots of food. clothing and a lamp through the glass of the second floor window. She then stabbed Rodney B. multiple times with a kitchen knife. When the police responded to the incident, Sabrina W. struggled with them, resisted arrest, screamed incoherently, and refused to cede possession of the knife in question. Sabrina W. was arrested and charged with Assault in the first degree, Breach of Peace, Resisting CT Page 7317 Arrest, and three counts of Risk of Injury to a Minor.[12] Aleese, Billie and Ba-Shan, who appeared frightened by the incident, were taken by ambulance to a local hospital and placed in DCF's care. (Exhibits 1, 3, 4, 9; Testimony of Steven F.)
While Sabrina W. was detained at York CI., DCF opened the case it had closed two months earlier. On May 26, 2000, the court (Lopez, J.) imposed a second set of steps upon Sabrina W., largely reiterating those assigned to her in October 1998. (Exhibits 10, 11.) In July 2000, Sabrina W. finished the Tier I substance abuse program at York CI. (Exhibit V; Testimony of Maria A.) Commencing on July 7, 2000, the children were brought to visit with Sabrina W. at the prison on a monthly basis. (Exhibit 1; Testimony of Maria A.)
On October 3, 2000, Sabrina W. was convicted of Assault in the second degree, stemming from the May 24, 2000 charges. She was sentenced to five years in jail, suspended after one year, with three years of probation. (Exhibit 3.) While incarcerated in June 2000, Sabrina W. was disciplined for disruptive conduct, and lost her visiting privileges for forty-five days. (Exhibit 16.) Aleese, Billie and Ba-Shan were adjudicated neglected on November 8, 2000 (Wiese, J.).
I.B. EVENTS FOLLOWING THE NEGLECT ADJUDICATION OF NOVEMBER 8, 2000
On March 14, 2001, Sabrina W. was transferred from York CI to Hartford House, a community release program which provided substance abuse education and relapse prevention. (Exhibit 4; Testimony of Maria A.) While her level of compliance with this residential program was generally satisfactory, Sabrina W. received a number of disciplinary reports reflecting her failure to comply with program rules and regulations. (Testimony of Roger K.) Sabrina W. contacted DCF on April 17, 2001, seeking assistance with housing: she was referred to the Waterbury Housing Authority. (Testimony of Maria A.) As noted above, the TPR petition against Sabrina W. was first filed on April 10, 2001: the amended petition was filed on April 30, 2001.
I.C. EVENTS FOLLOWING THE FILING OF THE APRIL 2001 TPR PETITIONS
On May 24, 2001, Sabrina W. concluded her stay at Hartford House and was discharged from the DOC. (Exhibits 4, N.) On that date, she commenced probation, which will continue until May 24, 2004. (Testimony of Yolanda M.)
In late June 2001, Sabrina W. commenced anger management at CFS through a mandate from the Office of Adult Probation. CFS also provided substance abuse treatment and screening, and individual counseling for Sabrina W. CT Page 7318 through James O., a licensed counselor with a master's degree in counseling. While working with CFS, Sabrina W. was generally cooperative and compliant, attended parenting classes, and finished an anger management group treatment program in September 2001. (Exhibits F, G.) Although she consistently tested negative for the use of drugs or alcohol, CFS staff noted that Sabrina W. was absent from a number of the counseling sessions.[13] CFS found the attendance issues to be "troublesome,"[14] and in November 2001, the agency reported that while Sabrina W. demonstrated good insight and coped well with life's stressors, she was still "seeking housing and employment." (Exhibits 17, G, K.)
In mid 2001, DCF referred Sabrina W. to parenting education services through the Family. Ties program: she attended two sessions in July. (Exhibits Q, R.) During the summer and fall of 2001, however, Sabrina W. failed to satisfactorily advise DCF of her whereabouts, and failed to attend two administrative case review (ACR) conferences. (Testimony of Maria A.) In the fall of 2001, at DCF's request, Sabrina W. was evaluated by Sidney Horowitz, Ph.D., a DCF consultant and a licensed clinical psychologist who has long experience in matters involving children and families. (Exhibits 12, 13.)
On March 26, 2002, Sabrina W. completed another CNA program through the Waterbury school system's division of Adult Continuing Education. (Exhibit U.) As of the time of trial, Sabrina W. had no designated employment and no income, but she was eligible for food stamps through the Department of Social Services. Since February 2002, Sabrina has occupied an efficiency apartment with one bath but no separate bedroom: through June of 2002, her rent will be paid through the Basic Needs Program. However, as of the time of trial, she had no specific plans to occupy a residence that would have adequate living space for the children. (Testimony of Maria A.; James O.) DCF continues to provide Sabrina W. with transportation for her twice-monthly visits with the children. (Testimony of Maritza R.)
I.D. BILLY F.
Billy F. was born in April 1950. He has a long history of drug abuse. Billy F. became involved with Sabrina W. and fathered Billie and Ba-Shan. During the children's early years, Billy F. did not assist Sabrina W. in meeting their obligation to pay rent. leading to the family's eviction in mid-1997. The evidence reflects that he has neither seen the children nor contributed to their well being in any way since that time.
Billy F. has never appeared in this matter, nor has he ever CT Page 7319 participated in any of the hearings relating to his children's welfare. On April 10, 2001, the court (Dewey, J.) found that all reasonable efforts to ascertain his address had been made and had failed, and ordered notice by publication. Specific notice concerning the pendency of the TPR proceedings was provided through The Connecticut Post and The New HavenRegister on April 20, 2001. Billy F. did not respond to either notice.
I.E. THE CHILDREN
Aleese was born on November 1995. She was placed in foster care at birth, due to the presence of cocaine in her system, and was returned to Sabrina W.'s care in July of 1996. Billie was born on February 1997. Sabrina W. continued to abuse substances, and in January 1998, both girls were placed in foster care after Sabrina F. left them unattended. Ba-Shan was born on September 1998. He lived with his mother in a residential treatment center for the first months of his life, joined by Aleese and Billie who returned to their mother's care in October 1999.
On May 24, 2000, all three children were removed from their mother's care upon her arrest for assaulting Rodney B. (Exhibit 1.) At that time, the children were placed together with Maritza R. and Juan L., in whose foster care they have remained for the past two years. Aleese had known Maritza R. since her first placement with her at birth in 1995, and Billie has known this foster mother since her initial placement in foster care in 1998. (Exhibit 2; Testimony of Maritza R.) All three children have lived approximately three quarters of their young lives in this foster home. They call their foster mother "mommy" and Juan L. is known as "Pops." Maritza R. and Juan L. wish to adopt the children. (Testimony of Maria A.; Maritza R.)
The three children are well-adjusted in their foster home. Aleese is in first grade, and is doing well, although she needs special help in reading. Ba-Shan has started attending a pre-school program, and is improving his social skills. At her pre-school program, Billie has recently demonstrated some oppositional behaviors that are disruptive and not age appropriate. She receives counseling at Child Guidance to deal with her behavior and her feelings of confusion concerning the permanency of her status in her foster home. (Exhibit 2; Testimony of Maritza R.)
 II. ADJUDICATION
In the adjudicatory phase of these proceedings,[15] the court has considered the evidence related to circumstances and events occurring prior to April 10, 2001 and April 30, 2001, the dates upon which the TPR allegations of abandonment and lack of an ongoing parent-child relationship were filed against Billy F.[16] With regard to the CT Page 7320 allegations of failure to achieve rehabilitation brought against Sabrina W., the court has considered the evidence and testimony related to circumstances occurring through the close of trial.[17] Upon review, as discussed below, the court has determined that statutory grounds for termination exist as to both Sabrina W. and Billy F.
II.A. LOCATION AND REUNIFICATION EFFORTS
The court finds that the petitioner has met her burden of proving, by clear and convincing evidence, that reasonable efforts were made to locate and reunify Sabrina W. with her children.[18] Based on the clear and convincing evidence produced at trial, the court finds that, under the circumstances of this case, both Sabrina W. and Billy F. are either unable or unwilling to benefit from reasonable reunification efforts as contemplated by General Statutes § 17a-112 (j)(1).[19]
Multiple services have been provided to Sabrina W. in an effort to reunify her in parenting role with the children at issue in this case. Over the years, DCF has offered her substance abuse treatment through Greenwich Hospital, Project Courage, Guenster Rehabilitation Center, the Regional Network program and ECAR. Parenting training and other services were offered through Project Courage, ECAR, Hall Neighborhood Service's IFP program, Family Ties, and Boys Village. (Exhibits 8, A, 5; Testimony of Charlotte S.) Through the criminal court system, Sabrina W. had the benefit of substance abuse treatment, parenting and life skills group therapy through CSI, MF, AA/NA, and CFS sessions: anger management counseling, parenting classes, individual and additional substance abuse treatment and screening were provided through CFS.[20] (Exhibit 17, D[1, 2, 4], F, G, H, R.) DCF provided visitation services and transportation while Sabrina W. resided at the CSI facility, and during her incarceration.[21] (Exhibits 1, C, D[5].)
In addition, as found in Part I., after the administration of an extensive array of rehabilitation services, Sabrina W. was been reunified with Aleese on two separate occasions, and was reunified with Billie as well. DCF had closed its case in October of 1997 and March of 2000: in each instance, the case was opened again because, Sabrina W. had not achieved the ability to function as an adequate or effective parent, and her children required placement in foster care to assure their safety. (See Part II.B.) Accordingly, the court concludes that although Sabrina W. has attended service programs, she is fundamentally either unable or unwilling to reap any meaningful, lasting benefit from reunification efforts.
Billy F. did not make himself available for these proceedings despite DCF's reasonable efforts to locate him as recorded in Exhibit 2, and the CT Page 7321 due notice referenced in Part I.D. Reunification services were inappropriate and unnecessary for Billy F. as he has not demonstrated any interest in his children, has never contacted DCF concerning the children's status, and because his location could not reasonably be determined. In view of this lack of interest and cooperation, the court concludes that Billy F. is unwilling or unable to benefit from any such services.
II.B. STATUTORY GROUNDS FOR TERMINATION AS TO SABRINA W.
II.B.1. FAILURE TO REHABILITATE — § 17a-112 (j)(3)(B)(i)
The petitioner first alleges that Sabrina W.'s parental rights should be terminated because she has failed to achieve rehabilitation within the meaning of § 17a-112 (j)(3)(B).[22] Sabrina W. counters that she has attended to the pivotal elements of the specific steps, and has made sufficient progress in rehabilitation to resume a responsible role in the lives of her children. As all three children have been adjudicated neglected,[23] the critical issue for this court is whether this respondent has achieved rehabilitation sufficient to render her able to care for Aleese, Billie and Ba-Shan. Applying the requisite legal standards[24] and construing the statute in compliance with the mandate of § 17a-112 (p),[25] the court finds this issue in favor of the petitioner.
Several aspects of the clear and convincing evidence in this case compel the conclusion Sabrina W. has yet to achieve a sufficient "level of rehabilitation . . . which would reasonably encourage a belief that at some future date she can assume a responsible position in her [children's lives]." In re Sarah Ann K., supra, 57 Conn. App. 448. See In re DanielC., supra, 63 Conn. App. 339, 354, 776 A.2d 487 A.2d (2001); In re AshleyS., supra, 61 Conn. App. 665. First, the credible psychological evidence in this case, presented through Dr. Horowitz, clearly and convincingly establishes that Sabrina W. has not achieved § 17a-112 (j)(3)(B) rehabilitation.[26] The court credits the reports of Dr. Horowitz's evaluations which showed that despite all the programs in which she has participated over the past decade, Sabrina W.'s judgment remains impaired to an extent that interferes with her parenting capacity. Sabrina W. is fundamentally unwilling or unable to accept responsibility for her actions, and she lacks a realistic ability to assess the quality of her conduct: she persists in downplaying the significance and seriousness of her past behavior, incidents of violence, and her chronic polysubstance abuse.[27] (Testimony of Dr. Horowitz.) Even after serving a term of incarceration, Sabrina W. illogically minimizes the implications of her assault upon Rodney B.[28] (Exhibit 12; Testimony of Dr. Horowitz.) Given her long history of alcohol and cocaine abuse, her history of CT Page 7322 repeated relapse, and Dr. Horowitz's thorough review of the multiple factors affecting Sabrina W.'s response to the rehabilitation process, the court accepts and credits this psychologist's opinion that Sabrina W. remains at significant risk for relapse. As Dr. Horowitz explained, Sabrina W.'s prognosis for safe and law abiding survival over the next few years, is "quite guarded." (Testimony of Dr. Horowitz.)
The court further credits Dr. Horowitz's conclusion that Sabrina W.'s constellation of personality styles renders her "at risk [for] becoming overwhelmed when confronted by new and complex circumstances and [for] demonstrating poor frustration tolerance when [she is] under stress" and thus adversely affect her ability to parent young children.[29]
(Exhibit 12.) Her personality traits include persistent anxiety, hostility, low self-esteem, a sense of helplessness and despair, and denial of the fact that her own poor parenting skills, limited judgment, substance abuse, and violent behavior have added to the turbulence which affects her children's lives.[30] From a psychological standpoint, all of the frustrations inherent to parenting become magnified as the children face the vicissitudes of school, society, and the demands of adolescence. Raising a child with special behavioral issues, such as Billie currently demonstrates, will increase the frustration load for her parent. Dr. Horowitz's well-founded opinion establishes that notwithstanding her years of services, Sabrina W. has demonstrated neither an adequate degree of insight into her own problems, nor an ability to adequately care for herself in a sustained manner.[31] Under these circumstances, as Dr. Horowitz cogently opined, if Sabrina W. is charged with the responsibility of caring for her three children, she will become frustrated, her hostility will surface, and she will not be able to provide them with adequate care. (Testimony of Dr. Horowitz.)
Second, the evidence clearly and convincingly indicates that Sabrina W. has failed to satisfactorily fulfill a number of the specific steps that were twice assigned to assist her in achieving rehabilitation. She has not obtained housing that is sufficient for her family's needs.[32]
She has not obtained lawful employment, and subsists on temporary housing support allotments, food stamps, and vouchers for personal items.[33]
(Exhibit 2.) She has returned to substance abuse on multiple occasions, and has violated the law by assaulting Rodney B. Sabrina W. did commence individual counseling with James O. in June of 2001, and she has improved her ability to express a degree of insight into her past poor choice of partners. However, Sabrina W. remains fairly introverted and generally has difficulty trusting people in general, significantly limiting her ability to model effective interpersonal relationships for any children in her care. (Exhibit 12; Testimony of Dr. Horowitz.)
Third, although Sabrina W. has participated in a number of substance CT Page 7323 abuse treatment programs, ostensibly completing the programs sponsored by CSJ and the DOC, it would be naive to conclude that by mere attendance and fulfilment of class requirements, the respondent has indeed achieved the ability to abstain from drugs and alcohol so as to enable her to safely parent her children.[34] Sabrina W.'s history reveals that while she may be able to demonstrate periodic sobriety after completing a residential treatment program, she has a clear tendency to relapse notwithstanding the best efforts of providers. (Exhibit A.) The grave implications of Sabrina W.'s substance abuse issues were apparent as early as 1993, when the court first found that she had failed to achieve rehabilitation despite treatment at Greenwich Hospital and Guenster, calling for the termination of her parental rights to Urich W. and Malcolm W. (Exhibits 14, 15.) Sabrina W.'s tendency to relapse despite treatment was notably obvious from her resumption of drug use after finishing the Project Courage program that she attended while Aleese was in foster care from November 1995 through July 1996. Again, after participating in the Regional program and ECAR to address her substance abuse and parenting deficiencies, Sabrina W. continued to have difficulty maintaining her sobriety and did not exercise appropriate judgment insofar as her children were concerned: as found in Part I.A., she left her daughters alone and unattended in January 1998, and again faced criminal charges as a result. Sabrina W. was unable to satisfy the court-ordered criteria of the Project Concern program to which she was referred, even though she was exposed to potential court sanctions.
Moreover, the evidence clearly and convincingly reflects that Sabrina W. relapsed yet again, notwithstanding her attendance at the mandated CSI residential long term treatment program from April 1998 through February 1999. This relapse is evidenced by her intoxication and subsequent involvement in the altercation of February 2000, and by her exercise of poor judgment in refusing to accept appropriate medical attention for her broken jaw. (Exhibit 7.) This relapse is further evidenced by her intentional, repeated stabbing of her domestic partner, Rodney B. on May 24, 2000; by her intoxication and obstreperous behavior in the children's presence; by her confrontation with the police who responded to the incident at her apartment; and by the dangerous conditions in which she permitted her children to live at that time.[35] (Exhibits 1, 3, 4, 9; Testimony of Steven F.)
The evidence reflects that Sabrina W. is resourceful, and that she has the ability to superficially cooperate with many service programs. She has the capacity to intermittently "remain clean and sober," and to perform relatively well as a caretaker for her children while under the supervision of a highly structured residential program, such as CSI. She has even demonstrated some ability to serve as a useful parent for limited periods of time. (Exhibit A; Testimony of Maria C.) However, her CT Page 7324 pattern of repeated substance abuse, followed by treatment, followed by a period of sobriety, followed by return to substance abuse, has been present throughout the lives of Aleese, Billie and Ba-Shan. The clear and convincing evidence impels the conclusion that unless she resides in a highly structured, supportive environment, such as a long-term treatment facility, Sabrina W. will again relapse, further exposing her children to harm. In view of these circumstances, it is clear that the respondent has not yet gained the ability to care for the particular needs of the children at issue. In re Sarah Ann K., supra, 57 Conn. App. 448.
Sabrina W. protests that she has achieved a stable lifestyle which enables her to care for her three children. She relies on the diagnosis of her counselor, James O., who indicates that her cocaine and alcohol abuse is in full remission, that her attendance at CNA training programs indicates her self-reliance, and that she is no longer in need of treatment.[36] (Testimony of James O.) The court did not find James O. credible insofar as his prognosis for Sabrina W. was concerned. Rather, the court accepts the well-founded psychological opinion of Dr. Horowitz, who concluded that despite years of interventions, Sabrina W. has not yet been able to develop the ability to utilize good judgment in the selection of partners or lifestyle, and that she is not yet independent but remains reliant upon others to provide the structure and support that is necessary for her to maintain a healthy lifestyle.[37]
While Sabrina W. may indeed have demonstrated some improvements in her substance abuse and related issues, showing some ability to modify her life in a positive fashion, "[a]lthough commendable, those improvements are not dispositive on the issue of [her] ability to care for [her children]." In re Stanley D., supra, 61 Conn. App. 233.[38]
Furthermore, balancing the weight of this progress against the restricted environment required for Sabrina W. to remain sober and her history of repeated relapse despite treatment, the court is constrained to conclude that although "the respondent had made some progress in recovering from drug abuse and in improving her parenting skills . . . those efforts were too little and too late" to affect her children in a positive manner. (Quotation marks omitted.) In re Sheila J, 62 Conn. App. 480-481, ___ A.2d ___ (2001).
The clear and convincing evidence reveals that from November 8, 2000 through April 10 and/or April 30, 2001, and continuing through the time of trial, Sabrina W. participated in rehabilitation regimens, yet she remains without the qualities necessary to successfully parent her children. Effectively, she was no better able "to resume the responsibilities of parenting at the time of filing the termination petition than [she] had been at the time of [the children's] commitment."In re Hector L., supra, 53 Conn. App. Given the ages, sensibilities, needs and satisfactory current placement of the children involved, and CT Page 7325 given Sabrina W.'s decade-long history of services and relapses, it would be unreasonable to conclude that she will be able to achieve rehabilitation from her substance abuse, anger, and parenting deficits, so as to be able to serve as a safe, responsible parent within a reasonable time. Accordingly, based on the clear and convincing evidence presented in this case, the court finds that the petitioner has proved that Sabrina W. has failed to achieve rehabilitation pursuant to §17a-112 (j)(3)(B).
 II.B.2. FAILURE TO REHABILITATE WITH PREVIOUS TERMINATION OF PARENTAL RIGHTS — § 17a-112 (j)(3)(E)
The petitioner next asserts that the statutory grounds for termination established by General Statutes § 17a-112 (j)(3)(F) exist in this case, supporting termination of her parental rights to all three children.[39] As found in Part I.A., Sabrina W.'s parental rights to her biological sons Urich and Malcolm were terminated by court order on August 12, 1993, pursuant to a petition filed by DCF. (Exhibits 14, 15.) Adopting the discussion concerning Sabrina W.'s failure to rehabilitate as set forth in Part II.B.1., the court finds, by clear and convincing evidence, that the petitioner has met her burden of proving the statutory grounds established by § 17a-112 (j)(3)(E).
II.C. STATUTORY GROUNDS FOR TERMINATION AS TO BILLY F.
Despite due notice, Billy F. has failed to appear at or to participate in these proceedings. Accordingly, the court finds him in default. Pursuant to Practice Book § 34-2, establishing that juvenile hearings are essentially civil proceedings, the default against Billy F. establishes admission of the material facts constituting the petitioner's cause of action, conclusively determining that the petitioner has prevailed on the TPR petition. Bank of America, FSB v. Franco,57 Conn. App. 688, 693, ___ A.2d ___ (2000). In addition, as discussed in Parts II.C.1. and 2., below, the clear and convincing evidence in this matter establishes that the petitioner has met her burden of proving the alleged statutory grounds for terminating Billy F.'s parental rights.
II.C.1. ABANDONMENT — § 17a-112 (j)(3)(A)
The petitioner first alleges that Billy F. abandoned his children Billie and Ba-Shan, within the meaning of § 17a-112 (j)(3)(A).[40]
In the absence of evidence to the contrary, applying the requisite legal standards[41] and construing the statute in compliance with the mandate of § 17a-112 (p), the court finds this matter in favor of the petitioner. CT Page 7326
The clear and convincing evidence related to Billy F.'s conduct reveals that from November 8, 2000 through April 10 or April 30, 2001, and continuing through the time of trial, this respondent failed "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . ." In re Deana E., supra, 61 Conn. App. 193. Billy F. has never provided any financial, emotional or physical care or support for Billie and Ba-Shan. He has not seen Billie since she was one year old, and has never seen Ba-Shan. Billy F. has never sent any cards, gifts, letters or other communications to either child. Billy F.'s whereabouts have been unknown since 1998, and he has not contacted DCF or the foster parents in an effort to learn the welfare of his son or daughter. (Exhibit 1.)
Whether the adjudicatory date of April 10 or April 30, 2001 is applied, the evidence in this matter clearly and convincingly establishes that Billy F. has failed the test of meeting "[t]he commonly understood obligations of parenthood" identified by In re Deana F., supra,61 Conn. App. 193. Accordingly, based on clear and convincing evidence presented in this case, the court finds that the petitioner has met her burden of proving that Billy F. has abandoned Billie and Ba-Shan, within the meaning of § 17a-112 (j)(3)(A).
 II.C.2. LACK OF ONGOING PARENT-CHILD RELATIONSHIPS — § 17a-112 (j)(3)(D)
The petitioner next alleges that no ongoing parent-child relationship exists between Billy F. and either Billie or Ba-Shan, and that the children's best interests will not be served by allowing additional time for this relationship to be developed, so that the TPR petition should be granted pursuant to General Statutes § 17a-112 (1)(3)(D).[42]
Applying the requisite legal standards, and construing the statute in compliance with the mandate of § 17a-112 (p), the court finds this matter in favor of the petitioner.
The relevant legal algorithm first requires the court to determine whether a parent-child relationship exists between Billy F. and his children.[43] In re Jonathon G., supra, 63 Conn. App. 525. In doing so, the court adopts the abandonment findings set forth in Part II.C.1., which; indicate that Billy F. has never functioned in a parental role for these children. In discerning the existence of a parent-children relationship, the court must also determine whether the children maintain any present feelings for Billy F. and, if so, whether those feelings are of a positive nature. In re Jonathon G., supra, 63 Conn. App. 525. The clear and convincing evidence establishes that Billie has never mentioned or expressed any feelings about Billy F., and that Ba-Shan, who has never seen his father, has no feelings for him that are of a positive nature. CT Page 7327 (Exhibit 1.) From this, it is apparent that no parent-child relationship exists between Billy F. and either child.[44] Furthermore, it would be detrimental to the children's best interests to allow additional time for a parenting relationship to be developed with Billy F.: they have never really known their biological father; he has never demonstrated an interest in them; they are in need of permanency, and are faring well in their current placement. In re Jonathon G., supra, 63 Conn. App. 525.
As the clear and convincing evidence in this case establishes that no ongoing parent-children relationship exists between Billy F. and the children, and that it is not in the best interests of either child to allow more time for this respondent to develop a relationship with his biological children, the petitioner has met her burden of proof under § 17a-112 (j)(3)(D). In re Jonathon G., supra, 63 Conn. App. 525;In re John C., supra, 56 Conn. App. 22.
 III. DISPOSITION
As the court has concluded that statutory grounds for termination exist, it next "must determine whether termination is in the best interests of the child." (Citation and quotation marks omitted.) In reQuanitra M, supra, 60 Conn. App. 103. In this dispositional phase, the court has considered the evidence and testimony related to circumstances and events through the close of evidence. Practice Book 33-5.
III.A. SEVEN STATUTORY FINDINGS
The court has made each of the seven written factual findings required by General Statutes § 17a-112 (k) based upon the clear and convincing evidence presented at trial, and has considered the evidence relevant to each of these findings in deciding whether to terminate parental rights.[45] See In re Jonathon C., supra,63 Conn. App. 528.
 III.A.1. TIMELINESS, NATURE AND EXTENT OF SERVICES — § 17a-112 (k)(1)
As set forth in Parts I. and II., DCF provided multiple timely and appropriate services for Sabrina W. Those services included parent training and substance abuse treatment through Greenwich Hospital, Project Courage, Guenster Rehabilitation Center, the Intensive Family Preservation program at Hall Neighborhood House, Inc.; the Regional Network program; the Empowering Children at Risk program; counseling through Catholic Family Services; Boy's Village In-Home Services; and the Family Ties program. In addition, through the criminal court system or the DOC, she has received services from Project Concern; the Tier I substance abuse education program; Community Solutions, Inc.; the Morris CT Page 7328 Foundation; Hartford House; and Catholic Family Services. Furthermore, the court has found in Part II.A. that this respondent is unwilling or unable to achieve timely benefit from the extension of additional reunification efforts.
Provision of services would have been inappropriate for Billy F., as he was unwilling or unable to benefit from any reunification or rehabilitative efforts.
 III.A.2. REUNIFICATION EFFORTS PURSUANT TO FEDERAL LAW — § 17a-112 (k)(2)
Through the services provided to Sabrina W. as described in Parts I. and II., DCF made reasonable efforts to reunite the children with this respondent. pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended. As to Billy F., the court reiterates its finding that he was neither able or willing to benefit from reunification efforts.
III.A.3. COMPLIANCE WITH COURT ORDERS — § 17a-112 (k)(3)
Sabrina W. partially complied with the specific steps imposed by the court in 1998 and again in 2000. She has kept her whereabouts known to DCF; participated in parenting classes; signed all releases; visited her children as often as DCF permitted. However, despite her program participation, the evidence reveals that this respondent has not satisfactorily fulfilled a number of fundamental aspects of the specific steps. Although she has attended programs, she has not successfully completed substance abuse treatment, and has been subject to recurrent relapses when not imprisoned or in a residential treatment facility. She has not timely secured a dependable source of legal income or housing that is sufficient to meet the growing children's needs, and she failed to inform DCF when Rodney B. came to live in her household. Notwithstanding the steps' specific proscription of such activity, she became involved with the criminal justice system, was convicted for assault, and faced a year of incarceration.
No orders were in effect in this case as to Billy F.
 III.A.4. THE CHILDREN'S FEELINGS AND EMOTIONAL TIES — § 17a-112 (k)(4)
All three children enjoy visiting with Sabrina W.: while they do not voluntarily inquire about their biological mother, they look forward to visits, and maintain a caring relationship with her. Even Aleese, the oldest of the children, does not identify Sabrina W. as a mother figure, CT Page 7329 although the children sometimes call her "Sabrina" and sometimes "Mom." Aleese is closely bonded to her brother, her sister, and to her foster family: she insistently desires to remain in residence at her foster home with her siblings. Billie and Ba-Shan are also firmly bonded to their siblings and to their foster family: like her older sister, Billie desires to be adopted by Maritza R. and Juan L. Neither Billie nor Ba-Shan have any positive emotional ties to Billy F. (Exhibits 1, 2; Testimony of Maritza R., Maria A.)
III.A.5. AGES OF THE CHILDREN — § 17a-112 (k)(5)
Aleese was born on November 1995 and is six and a half years old. Billie was born on February 1997, and is five years old. Ba-Shan was born on September 1998 and is three and a half years old. All three of the children have been in foster care for the better part of their lives.
 III.A.6. PARENTS' EFFORTS TO ADJUST THEIR CIRCUMSTANCES — § 17a-112 (k)(6)
While she has attended some rehabilitation programs and has even maintained some periods of sobriety, Sabrina W. has repeatedly relapsed into her life-long pattern of substance abuse and criminal behavior. Overall, she has not made realistic and sustained efforts to conform her conduct to acceptable parental standards. Billy F. has not maintained adequate contact with the foster parents or DCF regarding the status of his children, and has not in any way adjusted his circumstances so that he can fulfill a parental role for either Billie or Ba-Shan. Giving either Sabrina W. or Billy F. additional time would not likely bring their parenting performance within acceptable standards sufficient to make reunification in the children's best interests.
 III.A.7. EXTENT TO WHICH PARENTS WERE PREVENTED FROM MAINTAINING RELATIONSHIPS WITH THE CHILDREN — § 17a-112 (k)(7)
No unreasonable conduct by the child protection agency, foster parents or third parties prevented either Sabrina W. or Billy F. from maintaining relationships with the children at issue in this case. Although the limitations inherent in the foster care system were in effect, Sabrina W.'s economic circumstances did not prevent the maintenance of such relationships.[46]
 III.B. BEST INTERESTS OF THE CHILDREN — § 17a-112 (j)(2)
The court is next called upon to determine whether terminating the parental rights of Sabrina W. and Billy F. would be in the best interests of Aleese, Billie, and Ba-Shan.[47] Applying the appropriate legal CT Page 7330 standards[48] to the facts which are clearly and convincingly apparent in this case, the court finds this issue in favor of the petitioner.
In determining whether termination of the respondents' parental rights would be in the children's best interests, the court has examined the relevant factors, which include their opportunities for sustained growth, development, well-being, stability and continuity of their environment; their length of stay in foster care; the nature of their relationship with the foster parents and biological parents; and the degree of contact maintained with their biological parents.[49] In reAlexander C., 60 Conn. App. 555, 559, ___ A.2d ___ (2000); In re ShyinaB., 58 Conn. App. 159, 167, ___ A.2d ___ (2000); In re Savanna M, supra,55 Conn. App. 816. In a matter such as this, the court is further called upon to balance the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with their biological parents. See Pamela B. v. Ment, 244 Conn. 296, 314, 709 A.2d 1089 (1998) (child's physical and emotional well-being must be weighed against the interest in preserving family integrity). Under such scrutiny, the clear and convincing evidence establishes that, in this matter, it is not in the children's best interests to continue to maintain any legal relationship with either parent.
It is clear that Sabrina W. loves Aleese, Billie and Ba-Shan, and that she is sincerely interested in their well-being.[50] Since her discharge from Hartford House, she has frequently called DCF to inquire about how the children are doing and to send loving messages to them. The children are happy to see Sabrina W. at their regular visits, to which the respondent always brings appropriate refreshments and sometimes gifts. (Testimony of Maria A.) However, when assessing the best interest issues in this case, it is important for all to acknowledge that parenting involves more than showing appropriate interest in and providing treats for one's offspring. Parenting involves significant capacity to provide nurturing care, and the ability to show dedication and consistent, predictable, safe and reliable support for the children in question. The circumstances of this case clearly and convincingly reflect that Sabrina W. has never reached the point where she can be relied upon to meet these critical elements of parenting. For all the children, but particularly where Billie's nascent behavioral problems are concerned, Sabrina W. lacks the personal psychological stability that is essential to parenting a child with such special needs. Overall, in this case, "[a] parent's love and biological connection . . . is simply not enough" to serve as the basis for continuing the legal relationship between the respondent mother and her children. In re Ashley S., supra,61 Conn. App. 667.
These children have forged a healthy, loving bond with Maritza R. and CT Page 7331 her husband Juan L. They are comfortable, happy, and secure in Maritza R.'s home, and they look to her for the security and guidance which is so fundamental to their well-being.[51] As a result of Sabrina W.'s repeated relapses and criminal convictions, the children have spent the majority of their years in Maritza R.'s foster home[52] and they have spent the last two years in continuous residence with their foster parents. The children are loved by their foster parents, who wish to adopt all three siblings and to provide a permanent home for them.
The children's counsel eloquently urges the court to find that although Sabrina W. may have the best of intentions, the children should not be made to wait any longer for her to achieve her goals. He has argued vigorously in favor of termination of parental rights, emphasizing the strong bond between all three children and their foster parents, and the security of their current residential situation. Indeed, our courts have recognized that "long-term stability is critical to a child's future health and development." In re Eden F., supra, 250 Conn. 709. Furthermore, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." when resolving issues related to the permanent or temporary care of neglected children. In re Alexander V., 25 Conn. App. 741, 748,596 A.2d 930 (1992); see also In re Juvenile Appeal (84-CD), 189 Conn. 276,292, 455 A.2d 1313 (1983).
It is not in the children's best interests to allow them to languish in foster care, awaiting Sabrina W.s development of an adequate parenting capacity and control over her violence and substance abuse issues: Aleese, Billie and Ba-Shan "should not be further burdened by having to wait for [their] mother to achieve the level of competency necessary" to serve as their parent. In re Amneris P., supra, 66 Conn. App. 385. Billy F. has shown no interest in the matter. The court therefore concludes that the children are entitled to the benefit of ending, without further delay, the long period of uncertainty as to the availability of their biological parents as their caretakers. Severance of their legal bonds to Sabrina W. and Billy F., freeing them for adoption, will best eliminate the stressful limbo which persists while the TPR issues remain before this court.
The court has balanced the children's intrinsic need for stability and permanency against the benefits of maintaining a legal connection with Sabrina W. or Billy F., and finds that the children's interests in sustained growth, development, well-being, and continuity and stability of their environment cannot be met by leaving them in foster care. In its totality, the evidence in this case clearly and convincingly militates in favor of termination of the respondents' parental rights. Pamela B. v.Ment, supra, 244 Conn. 313-314. Accordingly, with respect to the best CT Page 7332 interests of the children contemplated by § 17a-112 (j)(2), by clear and convincing evidence, and based upon all of the foregoing, including the testimony and evidence presented, the court finds that termination of the parental rights of Sabrina W. is in the best interest of Aleese W., Billie F., and Ba-Shan W.; and further finds that termination of the parental rights of Billy F. is in the best interest of Billie F. and Ba-Shan W.
 IV. ORDER OF TERMINATION
WHEREFORE, after due consideration of the children's sense of time, their need for a secure and permanent environment, the relationship they have developed with their foster parents. and the totality of circumstances; and having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights; and having concluded that the termination of the parental rights at issue will be in the children's best interests, the court issues the following ORDERS:
That the parental rights of Sabrina W. are hereby terminated as to the child Aleese W.
That the parental rights of Sabrina W. and Billy F. are hereby terminated at to the children Billie F. and Ba-Shan W.
That the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for all three children for the purpose of securing an adoptive family or other permanent placement for them.
That a permanency plan shall be submitted within 30 days of this judgment, and that such further reports shall be timely presented to the court, as required by law. That primary consideration for adoption of all three children shall be offered to their current foster parents.
BY THE COURT,
N. Rubinow, J.